## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2011-NMSC-024

Filing Date:  May 24, 2011

Docket No. 31,619

STATE OF NEW MEXICO,

       Plaintiff-Appellee,

v.

ODEN GUTIERREZ,

       Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY
Sandra A. Price, District Judge

Hugh W. Dangler, Chief Public Defender
J.K. Theodosia Johnson, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Farhan Khan, Assistant Attorney General
Santa Fe, NM

for Appellee

### OPINION

**CHÁVEZ, Justice.**

{1}    Defendant Oden Gutierrez (Child), a sixteen-year-old, confessed to shooting and killing Thomas Powell (Powell) in Powell's home and stealing his car.  Child was charged by criminal information with an open charge of murder, aggravated burglary, armed robbery for stealing a car and car keys while armed with a deadly weapon, and unlawful taking of a motor vehicle.  A jury found him guilty on all counts and he was sentenced to life in prison plus nineteen and one-half years.

1

**{2}** Child appeals pursuant to Rule 12-102(A)(1) NMRA and Article VI, Section 2 of the New Mexico Constitution, which provide for direct appeal to the Supreme Court of a conviction resulting in a sentence of life imprisonment. Child raises several issues, which fall into four categories: (1) the suppression of evidence, namely, his confession and the shoes he was wearing when he was arrested, which were taken from him when he was booked into a juvenile facility; (2) change of venue due to prejudicial pre-trial publicity; (3) a double jeopardy violation for his convictions of both armed robbery and the unlawful taking of a motor vehicle; and (4) an unlawful sentence because (a) it was rendered without a pre-sentence report, (b) the district court incorrectly presumed that a life sentence was mandatory for a serious youthful offender, and (c) the life sentence was cruel and unusual punishment. We conclude that first, the confession was admissible because Child knowingly and intelligently waived his *Miranda* rights, he voluntarily consented to the interrogation, and he voluntarily confessed. The shoes were also admissible because they were taken during a constitutional inventory search. Second, the district court did not abuse its discretion in denying the motion to change venue because voir dire of the jury did not reveal any prejudice of the panel from the pre-trial publicity that had occurred several months before the trial. Third, because Child's conviction of armed robbery required proof of the taking of Powell's car, which was the same proof required for the unlawful taking of the vehicle conviction, conviction for both crimes is a violation of double jeopardy, and therefore the unlawful taking of a vehicle conviction is vacated. Finally, because a mandatory pre-sentence report was not provided to the district court or the parties before the sentence was imposed on Child, we remand for re-sentencing only after both the court and the parties have received a pre-sentence report.

## I.    SUPPRESSION OF EVIDENCE

**{3}** On December 10, 2007, authorities in Nevada arrested Child on two outstanding New Mexico warrants that appeared in the Federal Bureau of Investigation's computerized index of criminal justice information, more commonly known as the NCIC system. One warrant pertained to Child's escape from the Albuquerque Boys Reintegration Center and the other to his suspected involvement, after his escape, in the killing of Powell at Powell's home in Farmington. Following his arrest, Child was booked into a juvenile detention facility in Las Vegas, Nevada and his shoes were taken from him as evidence of a crime.

**{4}** The next day New Mexico detectives Cordell Tanner (Tanner) and Kyle Lincoln (Lincoln) of the San Juan County Sheriff's Office traveled to Nevada and conducted an audio-recorded custodial interrogation of Child at the juvenile detention center. During the interrogation, Child made certain inculpatory statements, ultimately confessing to shooting and killing Powell so that he could steal Powell's car.

**{5}** Child filed a motion to suppress as evidence his statements and confession, advancing several arguments to demonstrate that waiver of his *Miranda* rights was not knowing and intelligent and his statements and confession were not voluntary, but were the product of duress. He also sought to suppress as evidence the shoes that were taken from

2

him when he was booked into the juvenile facility, contending that the seizure of his shoes was unconstitutional. For the following reasons, we reject Child's arguments.

## A. CHILD KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVED HIS *MIRANDA* RIGHTS

**{6}** In support of his argument that he neither knowingly, intelligently, and voluntary waived his *Miranda* rights nor voluntarily confessed during the custodial interrogation, Child claims that (1) his mental impairment, caused by attention deficit hyperactivity disorder (ADHD), coupled with the fact that Spanish is his primary language, made it difficult for him to fully understand the *Miranda* warnings he was given; (2) Tanner exploited Child's upbringing in a traditional Latino household where he was taught to be polite and deferential to authority figures; (3) he did not comprehend that his confession would be an overwhelming determinant of his guilt or innocence; (4) he did not validly waive his rights because he did not sign a waiver; and (5) Tanner promised him leniency to get him to confess.

**{7}** On appeal of a district court's decision to deny a motion to suppress inculpatory statements,

> we accept the factual findings of the district court unless they are clearly erroneous, and view the evidence in the light most favorable to the district court's ruling. The ultimate determination of whether a valid waiver of [*Miranda*] rights has occurred, however, is a question of law which we review de novo.

*State v. Martinez*, 1999-NMSC-018, ¶ 15, 127 N.M. 207, 979 P.2d 718 (internal quotation marks and citation omitted). Before statements obtained during a custodial interrogation may be introduced at trial, the State must demonstrate "a knowing, intelligent, and voluntary waiver" of constitutional rights by a preponderance of the evidence. *Id.* ¶¶ 13-14. "Both the Fifth Amendment protection against self-incrimination and the Fourteenth Amendment right to due process negate admissibility of a confession elicited through intimidation, coercion, deception, assurances, or other police misconduct that constitutes overreaching." *State v. Setser*, 1997-NMSC-004, ¶ 9, 122 N.M. 794, 932 P.2d 484. In addition, the Fifth Amendment has been interpreted as requiring the State, prior to a custodial interrogation of an accused, to advise the accused (1) of the right to remain silent; (2) that any statement made by the accused may be used as evidence against him or her; and (3) of the right to the presence of an attorney, either retained or appointed. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). As with adults, the legitimacy of a child's waiver of *Miranda* rights is resolved by assessing the totality of the circumstances. *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

**{8}** With respect to children, we have interpreted NMSA 1978, Section 32A-2-14(E) (2003) as codifying factors relevant to the totality of the circumstances, similar to those approved by the U.S. Supreme Court in *Fare*, 442 U.S. at 725. *See Setser*, 1997-NMSC-004,

¶ 13.  Section 32A-2-14(E) provides:

> In determining whether [a child over the age of fifteen] knowingly, intelligently and voluntarily waived the child's rights, the court shall consider the following factors:
>
> (1)     the age and education of the respondent;
>
> (2)     whether the respondent is in custody;
>
> (3)     the manner in which the respondent was advised of the respondent's rights;
>
> (4)     the length of questioning and circumstances under which the respondent was questioned;
>
> (5)     the condition of the quarters where the respondent was being kept at the time of being questioned;
>
> (6)     the time of day and the treatment of the respondent at the time of being questioned;
>
> (7)     the mental and physical condition of the respondent at the time of being questioned; and
>
> (8)     whether the respondent had the counsel of an attorney, friends or relatives at the time of being questioned.

We have, however, emphasized "some of the circumstances that may be particularly relevant for a juvenile, such as the presence of a relative or friend." *Martinez*, 1999-NMSC-018, ¶ 18.

**{9}**     We therefore proceed to analyze the totality of the circumstances surrounding Child's interrogation, bearing in mind that the waiver inquiry

> has two distinct dimensions.  First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citations omitted).

**{10}**     The facts surrounding Child's custodial interrogation are not in dispute.  Tanner and

4

Lincoln arrived at the juvenile detention facility in Nevada at approximately 10:00 a.m. on December 11, 2007. They found Child visiting with his mother in the facility's cafeteria. Tanner introduced himself and told Child he wanted to visit with him. Child agreed, and Tanner took him into an approximately fifteen by fifteen foot office located nearby, while Child's mother waited in the cafeteria. Once in the office, Tanner set up an audio recording device and sat across a table approximately four to five feet away from Child. Lincoln sat next to Tanner, but was even further away from Child. Tanner read Child his *Miranda* rights and Child acknowledged the reading of each right by nodding his head. After reading Child his rights, Tanner asked him whether he understood them, and Child answered, "Yes sir." Tanner told Child, "You can visit with us, if you wanna stop you can stop, o.k.?" Tanner then asked Child if he wanted to visit with the detectives, to which Child asked, "Is it alright if I call my mom in here?" Tanner answered, "Yeah, absolutely." The detectives then brought Child's mother into the room and began questioning him. Child proceeded to answer each of Tanner's questions. Child stated that he escaped from the Albuquerque Boys Reintegration Center in late October of 2007, and that after he had escaped he went to Powell's door, found it to be open, and saw Powell's "body laying there." About halfway through the interrogation, and prior to actually confessing, Child asked, "Um, is it alright if I can visit with my mom and you guys can talk to me then?" Tanner responded, "You guys can visit, it's not like you're gonna be hauled out of here, dude. I think she'll be supportive of you. She understands you've been through a f---ing hard life. Okay? But we need to get through this first." Following the denial of this request, Child asked his mother to leave the room, and she did. Child then asked, "Where do you want me to start?" Tanner asked Child to "[j]ust explain what happened, man."

{11} With his mother out of the room, Child gave a different account of what happened. He stated that after his escape he decided he needed a car to get to Las Vegas, Nevada, to visit his mother. He went to Powell's house and knocked on the door, and when Powell opened the door, Child pulled out a gun. Although he did not want to kill Powell and just wanted his car, once he was inside Powell's house Child realized that Powell would know his whereabouts, so he "just shot him" and then fled the state in Powell's 1996 Oldsmobile.

{12} During the hearing on the motion to suppress Child's confession, Dr. Mark Irwin, a clinical psychologist, testified to several opinions on Child's behalf. Dr. Irwin stated that Child suffers from ADHD and Spanish is his primary language, although he can also speak English fluently and had been able to do so for many years. He then opined that it would be difficult for Child to take in "a lot of information" if it was given to him "rapidly" in English. Dr. Irwin said that he had listened to the recording of Child's interrogation and "suspect[ed] that [Child] was not focusing and able to process [the *Miranda* warnings issued by Tanner] very efficiently." After the hearing, the district court entered an order denying Child's motion to suppress. Child's statements, including the audio recording of his interrogation and a transcript of it, were later admitted into evidence against him at trial.

{13} In this case, we first assess whether Child's waiver was knowing and intelligent, i.e., whether it was "made with a full awareness of both the nature of the right being abandoned

and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421. There is no bright line test for determining when a child sufficiently comprehends his or her rights so as to effectuate a valid waiver; instead, we look to the totality of the circumstances and the factors enumerated in Section 32A-2-14(E). *Setser*, 1997-NMSC-004, ¶ 14.

{14}    In *Setser*, we were asked whether a sixteen-year-old who suffered from mental and emotional problems, including attention deficit disorder and hyperactivity, had validly waived her rights prior to making inculpatory statements to the police. 1997-NMSC-004, ¶¶ 5-7. Pre-trial testing and the testimony of a clinical psychologist revealed that Setser's intelligence level was possibly subnormal and that she was "passive and easily dominated . . . and willing to go to great extremes to get approval from others." *Id.* ¶ 6. We concluded that "[a]lthough there is testimony that Setser suffers from certain conditions and disorders that affect her cognitive abilities, there is no evidence that she lacks sufficient intelligence to understand her rights and the repercussion of waiving those rights." *Id.* ¶ 14.

{15}    In this case, we similarly conclude that, notwithstanding Child's ADHD diagnosis, there is no evidence that he lacks sufficient intelligence to have understood his rights or the consequences of waiving them. Evidence in the record supports the district court's findings that Child was sixteen years and eleven months old at the time of his interrogation, he had been advised of his rights on previous occasions, and he had, in fact, refused to speak to authorities without a lawyer present on at least one of these occasions. In addition, Child possessed a lengthy juvenile arrest record and had appeared in court several times. On these facts, we are not persuaded that Child's ADHD prevented him from sufficiently understanding his rights or the consequences of waiving them. One advantage of the totality-of-the-circumstances approach is that it allows courts "to take into account those special concerns that are present when young persons, often with limited experience and education and with immature judgment, are involved." *Fare*, 442 U.S. at 725. Another advantage is that it "refrains from imposing rigid restraints on police and courts in dealing with an experienced older juvenile with an extensive prior record who knowingly and intelligently waives his Fifth Amendment rights and voluntarily consents to interrogation." *Id.* at 725-26.

{16}    We are likewise not persuaded that Child was unable to understand the warnings provided to him due to the fact that he is primarily a Spanish speaker, especially in light of Dr. Irwin's testimony that Child is also a fluent English speaker. Indeed, we find little reason to doubt that Child speaks sufficient English to understand his *Miranda* rights when they were read to him. At no point during his interrogation did Child claim not to understand what was being said or otherwise indicate any problems with comprehension. Instead, he acknowledged the reading of each of his rights, and when asked if he understood those rights, he responded by saying "yes sir." Further, he did not simply answer "yes" or "no" to Tanner's other questions, but he was also able to give detailed, narrative responses. Thus, the transcript and recording of his interrogation reveal that he had no difficulty comprehending the questions that were asked of him or effectively communicating his responses. On this record, we fail to see any indication that Child's language abilities posed

any obstacle to his understanding of his rights or the consequences of waiving them.

{17}    Child also suggests that he did not knowingly and intelligently waive his rights because he did not sign a written waiver or comprehend that his confession would be an "overwhelming determinant" of his guilt or innocence.  However, a waiver "need not be reduced to writing and signed by [the] defendant," *State v. Smith*, 80 N.M. 126, 129, 452 P.2d 195, 198 (Ct. App. 1969), and we can see from both the transcript and the recording of the interrogation that Child began answering questions immediately after being advised of his rights, stating that he understood those rights.  Under these circumstances, we conclude that Child's conduct constitutes an implied waiver.  *See Martinez*, 1999-NMSC-018, ¶ 23 (finding implied waiver by juvenile based on his course of conduct in answering police questions after being advised of *Miranda* rights).

{18}    We find support for our determination of an implied waiver in *Berghuis v. Thompkins*, in which the U.S. Supreme Court explained that

> [t]he course of decisions since *Miranda*, informed by the application of *Miranda* warnings in the whole course of law enforcement, demonstrates that waivers can be established even absent formal or express statements of waiver that would be expected in, say, a judicial hearing to determine if a guilty plea has been properly entered.

___ U.S. ___, ___, 130 S. Ct. 2250, 2261 (2010).  The Court added that

> [t]he main purpose of *Miranda* is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel.  Thus, "[i]f anything, our subsequent cases have reduced the impact of the *Miranda* rule on legitimate law enforcement while reaffirming the decision's core ruling that unwarned statements may not be used as evidence in the prosecution's case in chief."

*Id.* (citations omitted).  In this light, the Court concluded that "a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." *Id.* at ___, 130 S. Ct. at 2264.

{19}    In this case, the record supports findings that Child understood his rights as they were read to him by Tanner, Child had been advised of his rights on previous occasions, and he had, in fact, refused to speak to authorities without a lawyer present on at least one of these occasions.  We believe these facts adequately establish that Child's age and experience were such that he was mature enough and experienced enough to understand the nature of his rights and the consequences of his decision to waive those rights.

{20}    As for Child's assertion that he did not know what weight his confession would be

7

given as evidence against him, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). *Miranda* and its progeny only require that Child be warned and understand that any statement made may be used as evidence against him. Child does not cite any authority, and we have found none, in which the potential weight a jury might ascribe to a confession must be explained to or understood by a defendant to effectuate a valid waiver.

**{21}** Finally, *Miranda* instructs that "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." 384 U.S. at 476. Having reviewed both the transcript and the audio recording of the interrogation, we find nothing to indicate that Child was threatened, tricked, or cajoled into waiving his rights and consenting to interrogation, and here, too, Child offers no argument on the matter. Therefore, under the totality of the circumstances, we conclude that Child knowingly, intelligently, and voluntarily waived his *Miranda* rights.

### 1. Child's Statements and Confession Were Not Elicited Through Intimidation, Coercion, Deception, Assurances, or Other Police Misconduct that Constitutes Overreaching

**{22}** Although we have concluded that Child knowingly, intelligently, and voluntarily waived his *Miranda* rights, Child also contends that his statements and confession were nonetheless coerced by implied promises and deception, thus rendering them involuntary and inadmissible. Whether the police coerced Child into confessing requires a separate analysis from Child's claim that he did not voluntarily waive his Fifth Amendment rights under *Miranda*. *State v. Fekete*, 120 N.M. 290, 298, 901 P.2d 708, 716 (1995).

> The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

*Culombe v. Connecticut*, 367 U.S. 568, 602 (1961); *see also State v. Evans*, 2009-NMSC-027, ¶ 33, 146 N.M. 319, 210 P.3d 216 ("We base our determination of whether a confession is voluntary on whether official coercion has occurred. Official coercion occurs when a defendant's will has been overborne and his capacity for self-determination [has been] critically impaired. There must be an essential link between coercive activity of the State . . . and a resulting confession by a defendant." (alteration in original) (internal quotation marks and citations omitted)). Before a confession may be admitted into evidence, the district judge must determine, as a threshold matter of law outside the presence of the jury, that the prosecution proved by a preponderance of the

evidence that the confession was voluntarily given. *Setser*, 1997-NMSC-004, ¶ 9. Once it has been admitted, the jury must then find that the confession was voluntarily given before the jury may use it for any purpose. UJI 14-5040 NMRA.

{23} The U.S. Supreme Court has offered a litany of factors to be considered by a district court in assessing whether a confession is voluntary.

> In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances–both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, e.g., *Haley v. Ohio*, 332 U.S. 596 [(1948)]; his lack of education, e.g., *Payne v. Arkansas*, 356 U.S. 560 [(1958)]; or his low intelligence, e.g., *Fikes v. Alabama*, 352 U.S. 191 [(1957)]; the lack of any advice to the accused of his constitutional rights, e.g., *Davis v. North Carolina*, 384 U.S. 737 [(1966)]; the length of detention, e.g., *Chambers v. Florida*, [309 U.S. 227 (1940)]; the repeated and prolonged nature of the questioning, e.g., *Ashcraft v. Tennessee*, 322 U.S. 143 [(1944)]; and the use of physical punishment such as the deprivation of food or sleep, e.g., *Reck v. Pate*, 367 U.S. 433 [(1961)]. In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted. *Culombe v. Connecticut*, [367 U.S. 568, 603 (1961)].

> The significant fact about all of these decisions is that none of them turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (parallel citations omitted).

{24} Dr. Irwin testified during the suppression hearing that Tanner "really made [Child] want to like him and want to go along with what he asked him to do." Dr. Irwin further explained that being raised in a traditional Latino household made Child deferential to authority figures, and that despite his extensive juvenile record, his upbringing created a situation in which Tanner was able to utilize his position of authority to convince him to confess.

{25} Relying on Dr. Irwin's testimony, Child claims that Tanner exploited the fact that he was raised in a traditional Latino household and was taught to be polite and deferential to authority figures. According to Child, Tanner did this by first approaching him as a friend and implicitly promising him that his cooperation would result in a juvenile disposition, and then explicitly telling him that he could not make any promises about his sentence or disposition. We recognize that

[t]he line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases such as this where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused.

*Haynes v. Washington*, 373 U.S. 503, 515 (1963). However, unlike an express promise of leniency, which can render a confession inadmissible as a matter of law, evidence of an implied promise is only a factor in the totality of the circumstances that courts consider in determining whether a confession is voluntary. *State v. Tindle*, 104 N.M. 195, 199, 718 P.2d 705, 709 (Ct. App. 1986). Accordingly, to determine whether Child's will was overborne, we examine the part of the interrogation where Tanner engaged in a monologue lasting several minutes in which Child claims implicit promises were made to coerce him to confess. Tanner stated:

After twenty-one they can't hold you anymore when they charge you as a juvenile. But on violent crimes they charge people... well someone over the age of fifteen, they can charge them as an adult. And there's no telling... do you see what I mean? But when a violent crime happens they look at that crime and they look at the person and if they're under eighteen, they look at them and see if they can be, what they call rehabilitated. That means a f---ed up person and they're always going to be f---ed up. And they charge them as adults. Or are they a person who messed up and they can be what they call rehabilitated, given some instruction in life... sent to school and some counseling. When there's a violent crime they look at that and decide whether they're going to hold someone accountable as an adult or as a juvenile. Now, something that's major in that is when a juvenile, someone under eighteen, does a violent crime and they can say "I f---ed up. I've had a rough life." And I did this f---ed up thing. I'm scared and I needed to get the hell out of here; I needed to get to Vegas. But if that person can take responsibility for what they've done, they say that person can be rehabilitated and almost always handle them as an adult. . . . And that's what you need to do is make people understand why what happened, happened. You need to give your side of this; but the true side. Because they're going to look at this moment and say cold-blooded, clear as day and night and he's going to [inaudible] cold blooded, f--- it and toss him to the wolves the rest of his life. I can't promise you what's going to happen, but I know that's going to have the biggest influence on this thing as anything. . . . I can help you through this. [Inaudible] tell the truth, so that when people look back on this day they're saying this is a young man who... it was a tragic mistake but he's not an animal who deserves to be tossed to the wolves. Can you help me? I can help you. I know it's hard, probably the hardest thing you've ever done. But let me help you through this. What happened... how did you meet Thomas Powell that day? I know this is hard man. It's probably the hardest thing

10

you've ever done.

**{26}**   It was after this monologue that Child asked to finish visiting with his mother. However, Tanner declined the request, indicating that Child could visit with his mother after he finished making his statement. At this point, Child asked his mother to leave the room, and then confessed the details of how he killed Powell. Following the confession, Child asked Tanner, "So what do you think might happen?" Tanner responded, "There's still a possibility it could turn [inaudible] because you've shown remorse. I can't tell you what's going to happen, I don't know."

**{27}**   After closely examining Tanner's statements and Child's reactions and responses, we conclude that while Tanner undoubtedly employed aggressive tactics, nothing he said could have reasonably led Child to believe that he had been promised leniency or a juvenile disposition in return for his confession. Instead, we conclude that it is far more likely that Child weighed and balanced competing considerations and then made an autonomous decision to confess. *See Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986) ("[T]he interrogator may play on the suspect's sympathies or explain that honesty might be the best policy for a criminal who hopes for leniency from the state. These ploys may play a part in the suspect's decision to confess, but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary." (citations omitted)).

**{28}**   Child's assertion that he was implicitly promised leniency conflicts with Tanner's explicit statement to Child that he couldn't promise him anything. Further, Child's assertion following his confession was belied when he asked Tanner, "What do you think might happen?" The timing of the question and the question itself reveal that Child was not in fact expecting a particular result prior to confessing. In addition, Child did not exhibit an adverse reaction when Tanner responded, "I can't tell you what's going to happen, I don't know." Judging by these statements and Child's reactions, or lack thereof, we conclude that Child simply did not heed Tanner's ultimate warning that nothing could be promised.

**{29}**   Finally, none of the other factors suggested by the *Schneckloth* Court in assessing the voluntariness of a confession under the totality of the circumstances weigh in Child's favor. The record reflects that Child, who was almost seventeen, was interrogated for less than one hour, during the late morning, after being advised of his rights and indicating that he understood his rights. His mother was present during the interrogation until Child asked her to leave. None of these circumstances lend support to a claim of involuntary confession. *Martinez*, 1999-NMSC-018, ¶¶ 22-24 (finding nothing objectionable about one-hour custodial interrogation of a child over age fifteen and noting with approval that the interrogation occurred at a time child could be expected to be alert); *see also State v. Jonathan M.*, 109 N.M. 789, 791, 791 P.2d 64, 66 (1990) (stating that child over age fifteen is unlikely to make an involuntary statement after receiving *Miranda* warnings).

**{30}**   In concluding our evaluation of the totality of the circumstances, the balance of the

relevant criteria leads us to conclude that Child's will "was not overborne and his self-determination was not critically impaired," and that his confession was therefore voluntarily given. *State v. Munoz*, 1998-NMSC-048, ¶ 38, 126 N.M. 535, 972 P.2d 847. As a result, we affirm the district court's denial of Child's motion to suppress his inculpatory statements.

## B.   CHILD'S SHOES WERE SEIZED DURING A VALID INVENTORY SEARCH

{31}   Child asserts that his shoes were improperly admitted as evidence because the shoes were not seized pursuant to a valid inventory search. An inventory search is constitutional if the inventory is made pursuant to an established police regulation, the search is reasonable, and the police have control or custody of the object of the search. *State v. Boswell*, 111 N.M. 240, 241, 804 P.2d 1059, 1060 (1991). It is also well settled that

> both the person and the property in his immediate possession may be searched at the station house after the arrest has occurred at another place and if evidence of crime is discovered, it may be seized and admitted in evidence. Nor is there any doubt that clothing or other belongings may be seized upon arrival of the accused at the place of detention and later subjected to laboratory analysis or that the test results are admissible at trial.

*United States v. Edwards*, 415 U.S. 800, 803-04 (1974) (footnote omitted). "Indeed, it is difficult to perceive what is unreasonable about the police's examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest." *Id.* at 806; *see also* 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 5.3(a) (4th ed. 2004) (discussing the constitutionality of searches and seizures upon arrival at a place of detention).

{32}   In this case, Child was arrested in Nevada, handcuffed, taken into custody, and driven to a local juvenile detention facility. Prior to booking Child into the juvenile facility, Sergeant David Stansbury contacted Detective Tanner of the San Juan County Sheriff's Office to advise him of Child's arrest. Tanner told Sergeant Stansbury that Child was suspected of wearing a white pair of shoes with a circle on the bottom at the time of the alleged homicide. Sergeant Stansbury confirmed that this description matched the shoes that Child was wearing at that moment. Child's shoes were seized when he was booked into the juvenile detention facility. The shoes were later transferred to the custody of the San Juan County Sheriff's Office and subsequently admitted into evidence at trial.

{33}   On appeal, Child does not challenge the fact that both he and his shoes were lawfully in custody when he was booked into the juvenile detention facility. Instead, Child contends that the State failed to present evidence regarding the policy and procedure for seizing the personal property of the person being incarcerated. We disagree. Our review of the record reveals that, contrary to Child's assertion, Sergeant Stansbury did testify to the relevant

policies and procedures for conducting inventory searches at the juvenile detention facility. *See State v. Wilson,* 116 N.M. 793, 798, 867 P.2d 1175, 1180 (1994) ("Inventory search procedures must be standardized, but need not be written."). This testimony indicated that taking a detainee's clothes was a normal part of the detention facility's booking procedure when the clothes either were not sufficient to be worn in the facility or were determined to have evidentiary value. We therefore conclude that Child's claim lacks merit because there was testimony regarding standard inventory practices at the Nevada juvenile detention facility. We affirm the district court's decision admitting the shoes as evidence.

## II.  VENUE

{34}    Child asserts that the district court abused its discretion when it denied his pre-trial motion for a change of venue from San Juan County. Child cited, inter alia, Article II, Sections 14 and 18 of the New Mexico Constitution and NMSA 1978, Section 38-3-3(B)(2) and (3) (2003) in support of his motion. Child argued there was a reasonable probability that he would be unable to obtain a fair trial by an impartial jury in San Juan County as a result of the pre-trial publicity and public excitement surrounding his case. Child attached numerous exhibits to his written motion, including but not limited to newspaper articles, editorials, and online forum postings. All of the articles centered on Child's multiple escapes, a few contained details of his alleged crimes and indicated that he had confessed to murder, and a few described him as dangerous or extremely dangerous. Most of the editorials and online forum postings contained individual opinions of Child's character and his alleged criminal conduct, some of which were clearly less than favorable, although others indicated support for Child. Also attached to Child's motion was a photograph that Child's trial counsel claimed was taken at the San Juan County courthouse where the trial was to be held. The photograph depicts an office window, presumably inside the courthouse, upon which is taped a newspaper article displaying a picture of Child following his recapture and arrest in Albuquerque. The following handwritten message was scrawled on top of the newspaper story: "South Siders–How about a Bake Sale to bail out your homie? Gang life Pays!" Child's motion also claimed that Child had been a subject on the television show "America's Most Wanted." Finally, Child's trial counsel submitted an affidavit testifying to his belief that an impartial jury "may not be obtained" in San Juan County because "[i]t has been my experience that the people of San Juan County are familiar with the Child's alleged escape from two juvenile facilities and pending case, and that the citizens believe him to be guilty." The State opposed the motion and the district court conducted an evidentiary hearing to address the venue question.

## A.    PREJUDICIAL PRE-TRIAL PUBLICITY CAN DEMONSTRABLY SUPPORT A CHANGE OF VENUE IN NEW MEXICO

{35}    The New Mexico Constitution guarantees every defendant a fair trial by an impartial jury. *See* N.M. Const. art. II, § 14 (as amended 1994) (guaranteeing "an impartial jury"); N.M. Const. art. II, § 18 (as amended 1972) (due process and equal protection). Section 38-3-3 helps effectuate these guaranties. That statute provides, in pertinent part:

A. The venue in all civil and criminal cases shall be changed, upon motion, to another county free from exception:

. . .

B. when the party moving for a change files in the case an affidavit of himself, his agent or attorney, that he believes he cannot obtain a fair trial in the county in which the case is pending because:

. . .

(2) the inhabitants of the county are prejudiced against the party;

(3) of public excitement or local prejudice in the county in regard to the case or the questions involved in the case, an impartial jury cannot be obtained in the county to try the case.

Section 38-3-3. A court may require evidence in support of a motion to change venue in addition to the affidavit, even when it is made for the first time, and even when it is made by a defendant. *See* NMSA 1978, § 38-3-5 (1929); *State v. House*, 1999-NMSC-014, ¶ 29, 127 N.M. 151, 978 P.2d 967; *State v. Lunn*, 88 N.M. 64, 70, 537 P.2d 672, 678 (Ct. App. 1975).

{36} Child asserts that he was not required to conclusively prove that it was impossible for him to obtain a fair trial in San Juan County for the district court to grant his motion. Further, he claims that he made a sufficient showing to the district court that he could not obtain an impartial jury in San Juan County on the basis of the presumed prejudicial effect of pre-trial publicity on the county's citizens.

{37} Child is correct that presumed prejudice based on pre-trial publicity can support a change of venue in New Mexico. Certainly, "there is no requirement in our constitution, statutes, or case law that a venue change should be supported by proof of actual prejudice through voir dire." *House*, 1999-NMSC-014, ¶ 55. Rather, it can be sufficient to "demonstrate a reasonable probability that a fair trial cannot be obtained in a particular venue." *Id.* ¶ 57. Further, we have explained that sufficient

[p]rejudice may be established if a community is so saturated by a barrage of inflammatory and biased publicity, close to the beginning of legal proceedings, that the trial inevitably takes place in an atmosphere of intense public passion. Under such circumstances there is a reasonable probability that prospective jurors were exposed to the sensational publicity, as well as the emotional atmosphere in the community, and that many of them are strongly predisposed for or against one of the parties in the case.

14

*Id.* ¶ 58 (citations omitted).

**{38}** This "presumed" form of prejudice is adequate to support a change of venue whenever the publicity is "demonstrably prejudicial," *id.* ¶ 57, and "close to the beginning of legal proceedings," *id.* ¶ 58. In *House,* we went to great lengths to discuss the many factors that courts consider when determining whether "prejudice from pretrial publicity has evolved to such a degree that a fair trial is improbable," and a motion for a change of venue should be granted on the basis of presumed prejudice. *Id.* ¶ 59; *see id.* ¶¶ 59-75 (discussing factors such as the neutrality of publicity, its timing in relation to the start of trial, its form and source, and the size of the community). The assessment of all factors that may be relevant to a particular case remains the proper method for district courts to utilize in resolving competing claims over the need for a change of venue due to presumed prejudice based on pre-trial publicity.

**B.** **THE DISTRICT COURT'S DENIAL OF CHILD'S MOTION FOR A CHANGE OF VENUE DOES NOT CONSTITUTE AN ABUSE OF DISCRETION BECAUSE IT WAS SUPPORTED BY SUBSTANTIAL EVIDENCE OBTAINED THROUGH VOIR DIRE**

**{39}** We review a district court's change of venue decision for an abuse of discretion, keeping in mind that its "discretion in this matter is broad and will not be disturbed on appeal unless a clear abuse of that discretion can be demonstrated." *Id.* ¶ 31. The party appealing the change of venue decision has the burden of establishing the abuse of discretion. *Id.* "The standard of review required in assessing most abuse-of-discretion claims is whether the trial court's venue determination is supported by substantial evidence in the record." *Id.* ¶ 32. "[T]he same standard of review applies to the trial court's decision–a determination based upon substantial evidence in the record–whether a venue change is based upon presumed or actual prejudice." *Id.* ¶ 46.

> We must be mindful that it is the role of the trial court, and not the appellate court, to weigh the evidence and determine the credibility of witnesses. We will not substitute our own judgment for a determination of the trial court that is supported by substantial evidence in the record.

*Id.* ¶ 33 (citation omitted). In other words, "the question for this Court is whether the trial court abused its discretion by denying Defendant's motion to change venue, not whether Defendant presented substantial evidence regarding prejudice to the trial court." *State v. Barrera,* 2001-NMSC-014, ¶ 14, 130 N.M. 227, 22 P.3d 1177.

**{40}** The evidentiary hearing on Child's motion was held on April 30, 2008. Child's trial counsel reiterated the argument made in his written motion–that there was a reasonable probability that Child would be unable to obtain a fair trial by an impartial jury in San Juan County because pre-trial publicity had disseminated irrelevant and prejudicial information about Child. The State countered that San Juan County was a large county and the time

between the publicity and the start of Child's trial would adequately diminish any effect the publicity might have had on the community. The State added that there had been no additional publicity since Child had been recaptured in late March 2008, after his escape from the San Juan County Detention Center earlier that month. Child did not challenge this assertion, much less demonstrate that the publicity had continued after his recapture. Nevertheless, he maintained that there was a reasonable probability that the residents of San Juan County would be tainted by the prejudicial publicity that had earlier surrounded his case due to his escape.

**{41}** At the end of the evidentiary hearing, the district court was not persuaded that Child had made a sufficient showing of presumed prejudice to support a change of venue. Specifically, the district court found that San Juan County was "large" and noted that in its past experience with voir dire, many jurors did not "read the paper [and] are not even aware of literally what's going on in the county around them." The district court concluded that at that time Child had made an insufficient showing to support a change of venue based on presumed prejudice. However, the district court also indicated that it was going to assess the actual prejudice of potential jurors through the voir dire process before making a final ruling on whether a change of venue was appropriate to ensure that Child received a fair trial by an impartial jury. The district court also announced that it intended to bring in an additional panel of potential jurors for the voir dire process and to allow for individual questioning by Child's counsel of any potential juror who indicated an awareness of Child's case based on pre-trial publicity.

**{42}** Seven months after the evidentiary hearing was held, voir dire was conducted and the district court directly inquired whether any of the potential jurors had been exposed to publicity involving either Child or his case. The two potential jurors who answered affirmatively were further asked whether they had already formed an opinion about either Child or his case. One individual answered the second question affirmatively. The district court then indicated that it would alert the attorneys to follow up with their own questions, and this additional questioning would take place in the privacy of the district court's chambers, if necessary. Following voir dire, a jury was impaneled and the trial commenced.

**{43}** In *Barrera*, we addressed a defendant's appeal of a district court's venue decision made under circumstances similar to those described in this case. 2001-NMSC-014, ¶¶ 10-18. There we explained that "if the trial court determines that a movant has not demonstrated presumed prejudice and proceeds with voir dire, we will limit our review to the evidence of actual prejudice." *Id.* ¶ 16. Still, "[a]s with all aspects of a venue change, the choice of waiting until after voir dire before granting a motion to change venue rests with the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion." *House*, 1999-NMSC-014, ¶ 55.

**{44}** In this case, the district court should not have relied upon its own personal experience and impressions of the citizens of San Juan County in determining that Child had made an insufficient showing to support a change of venue based on presumed prejudice. *See id.* ¶¶

68-69 ("We are concerned that, in discussing this issue, the trial judge inserted his own impressions of the citizens of Taos . . . . In the past, we have expressed disapproval of trial judges who base a venue decision on their own opinions and impressions."). Further, there is nothing in the record to support the conclusion that San Juan County is a large county. Nonetheless, we conclude that these indiscretions are insignificant in light of the substantial time that elapsed between the publicity cited by Child and the start of his trial. *See id.* ¶ 60 ("If detrimental articles and broadcasts appeared months or years before the beginning of a trial, the probability of prejudice is significantly reduced." (citing *Patton v. Yount*, 467 U.S. 1025, 1034 (1984) and *Murphy v. Florida*, 421 U.S. 794, 802 (1975)).

**{45}** Further, when the record reflects that the district court decided to impanel a jury from the available jurors after voir dire, we will conclude that the district court implicitly determined that actual prejudice did not exist, even though no written order has been entered to that effect. *See State v. Vasquez*, 2010-NMCA-041, ¶ 37, 148 N.M. 202, 232 P.3d 438 (citing *Stinson v. Berry*, 1997-NMCA-076, ¶ 8, 123 N.M. 482, 943 P.2d 129). Voir dire allows a court to "determine whether prospective jurors will be able to reach a verdict based solely on evidence received in open court, not from outside sources." *House*, 1999-NMSC-014, ¶ 52 (internal quotation marks and citation omitted). Use of voir dire can establish "whether there is such widespread and fixed prejudice within the jury pool that a fair trial in that venue would be impossible." *Id.* ¶ 46. Accordingly,

> courts will change a venue based upon actual prejudice if they find that the opinions of the community, as reflected by the opinions of prospective jurors in voir dire, are so fixed that, were the trial to be held in that community, the jurors would be unlikely to lay aside their preconceived notions and base their judgment exclusively on the evidence presented at trial.

*Id.* ¶ 56.

**{46}** Finally, because "voir dire is evidence to be used by the trial court in reaching its decision," *State v. Robinson*, 94 N.M. 693, 696, 616 P.2d 406, 409 (1980), *holding limited on other grounds by Sells v. State*, 98 N.M. 786, 788, 653 P.2d 162, 164 (1982), we find that the district court's change of venue decision is supported by substantial evidence obtained during voir dire when there is nothing offered by the appellant to indicate "that any of the jurors who actually tried the case were in any way tainted by any of the publicity," *Deats v. State*, 80 N.M. 77, 80, 451 P.2d 981, 984 (1969).

**{47}** In this case, the district court determined that Child did not make a sufficient showing of presumed prejudice and deferred a final ruling on the motion until after voir dire. Child has offered neither evidence nor testimony to prove that any of the jurors who tried the case were actually prejudiced in any way, let alone exposed to or tainted by either the pre-trial publicity or the photograph that he alleges he found in the courthouse. Consequently, we affirm the district court's denial of Child's motion to change venue.

17

### III. DOUBLE JEOPARDY

{48}  Under the laws enacted by our Legislature, taking of a motor vehicle and taking *anything* of value by use of force or threatened force are separate statutory offenses. *See* NMSA 1978, § 66-3-504(A)(2) (1998) (recompiled and amended as NMSA 1978, § 30-16D-1 by Laws 2009, ch. 253, § 1 and Laws 2009, ch. 261, § 1) (unlawful taking of a motor vehicle); NMSA 1978, § 30-16-2 (1973) (robbery).  Child claims that his convictions for armed robbery, an enhanced version of robbery described as occurring when a robbery is committed "while armed with a deadly weapon" contrary to Section 30-16-2, and for unlawful taking of a motor vehicle contrary to Section 66-3-504(A)(2), violate the protection against multiple punishments for the same offense provided by the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.  Child's brief references *State v. McGruder*, where we held that under a strict application of the "elements test" set out in *Blockburger v. United States*, 284 U.S. 299, 304 (1932), and adopted by this Court in *Swafford v. State*, 112 N.M. 3, 13-14, 810 P.2d 1223, 1233-34 (1991), convictions for these two offenses did not constitute a double jeopardy violation.  1997-NMSC-023, ¶¶ 33, 39, 123 N.M. 302, 940 P.2d 150, *abrogated on other grounds by State v. Chavez*, 2009-NMSC-035, ¶ 26, 146 N.M. 434, 211 P.3d 891.  While acknowledging *McGruder*, Child seeks to distinguish his case from *McGruder*, and to do so he asks this Court to examine the jury instructions given in his case, effectively arguing for the application of a modified version of the *Blockburger* test.  *See Swafford*, 112 N.M. at 8 n.4, 810 P.2d at 1228 n.4 (citing *Whalen v. United States*, 445 U.S. 684 (1980) as an example of "departure from the strict elements application of *Blockburger*," and further referencing *Pandelli v. United States*, 635 F.2d 533, 537 (6th Cir. 1980), a case that both applies such a departure and discusses the rationale for it).  We find the rationale discussed in *Pandelli* to be directly applicable to Child's claim in this case and, for the reasons that follow, we today adopt a modified version of the *Blockburger* test for double jeopardy claims involving statutes that are "vague and unspecific," in addition to those that are "written with many alternatives."  *Pandelli*, 635 F.2d at 538.

### A.  CHILD'S CONVICTIONS FOR UNLAWFUL TAKING OF A MOTOR VEHICLE AND ARMED ROBBERY PUT HIM TWICE IN JEOPARDY FOR THE SAME OFFENSE

{49}  We review Child's claim of double jeopardy de novo.  *State v. Quick*, 2009-NMSC-015, ¶ 6, 146 N.M. 80, 206 P.3d 985.  The Double Jeopardy Clause of the Fifth Amendment was held to be applicable to the states by the Fourteenth Amendment Due Process Clause in *Benton v. Maryland*, 395 U.S. 784, 794 (1969).  The clause provides: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  It functions in part to protect "'against multiple punishments for the same offense.'"  *Swafford*, 112 N.M. at 7, 810 P.2d at 1227 (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)).  Child's claim is a "double-description" form of a multiple punishment because he was charged with violations of multiple statutes that may or may not be deemed the same offense for double jeopardy purposes.  *See State v. DeGraff*,

2006-NMSC-011, ¶ 25, 139 N.M. 211, 131 P.3d 61.

**{50}** It is well established that "the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366 (1983). "[W]here the legislature has explicitly authorized multiple punishment the judicial inquiry is at an end, [and] multiple punishment is authorized and proper." *Swafford*, 112 N.M. at 9, 810 P.2d at 1229. The result of these established principles is that "the Legislature is not restrained by double jeopardy from atomizing a defendant's conduct into multiple punishments if they are imposed in a single proceeding. The courts, however, are restrained from doing so without legislative authorization, and therefore legislative intent must be the touchstone of our inquiry." *Quick*, 2009-NMSC-015, ¶ 7.

**{51}** In *Swafford*, "this Court synthesized the many varied theories set forth in both New Mexico and federal decisional law to come up with a single test for multiple punishment cases." *State v. Frazier*, 2007-NMSC-032, ¶ 14, 142 N.M. 120, 164 P.3d 1 (citing *Swafford*, 112 N.M. at 8, 810 P.2d at 1228). The synthesis performed in *Swafford* resulted in our adoption of what is generally a two-part inquiry for double- description claims, first analyzing "whether the conduct underlying the offenses is unitary, *i.e.*, whether the same conduct violates both statutes," and, if so, proceeding to analyze "whether the legislature intended to create separately punishable offenses." 112 N.M. at 13, 810 P.2d at 1233.

1.      **Child's Conduct Underlying the Crimes of Armed Robbery and Unlawful Taking of a Motor Vehicle Was Unitary**

**{52}** Child properly references *McGruder* in his briefing on the double jeopardy issue, *see* Rule 16-303(A)(2) NMRA (citation of adverse authority), yet, for the reasons that follow, that case is distinguishable from the instant case and does not control the outcome here. Instead of arguing the merits of overruling *McGruder*,[1] Child argues that the jury instructions provide a starting point for distinguishing between the two cases. In *McGruder*, "[t]he jury was charged . . . on armed robbery based on the evidence of the taking of [the victim's] keys," 1997-NMSC-023, ¶ 9, meaning the jury was only instructed to consider whether the defendant stole keys when it considered the conduct supporting the charge of armed robbery. On the other hand, in the instant case, because Child was charged with armed robbery for taking *both* Powell's "1996 Oldsmobile bearing New Mexico license plate GMD807 *and* car keys" (emphasis added), the jury was instructed to consider whether he stole both car keys and a car when it deliberated upon the conduct supporting the charge of armed robbery.

---

[1]*See State v. Riley*, 2010-NMSC-005, ¶¶ 39-49, 147 N.M. 557, 226 P.3d 656 (Chávez, C.J., specially concurring) (Bosson, J., concurring in part and dissenting in part) (Daniels, J., specially concurring) (agreeing with the decision not to overrule an earlier opinion absent argument by the parties).

**{53}** We take judicial notice of the record in *McGruder* to be certain of the distinction between the conduct that supported the charge in *McGruder* and the conduct Child was alleged to have perpetrated to support the charge of armed robbery in this case. *See State v. Dominguez*, 2005-NMSC-001, ¶ 9, 137 N.M. 1, 106 P.3d 563 (taking judicial notice of the jury instructions in a previous case that was on our docket). According to the record in *McGruder*, the defendant was in fact indicted on the charge of armed robbery solely for taking his victim's keys. We are also able to confirm from the record that the *McGruder* opinion accurately indicates the jury was only instructed to consider whether the defendant stole keys when it considered the conduct supporting the charge of armed robbery in that case. Accordingly, we conclude that the crime of armed robbery and the conduct supporting that charge in *McGruder* are necessarily distinguished from the crime of armed robbery and the conduct supporting that charge in the instant case. The distinction between stealing keys and stealing keys along with the car appears to be a distinction without a difference because common sense suggests that the purpose for stealing the keys to a car is to steal the car. However, this distinction calls into question the analysis and conclusion reached by this Court in *McGruder* as opposed to the approach taken in this case, in which we consider the prosecution's theory as expressed in the charging document and the jury instructions.

**{54}** Nevertheless, we note that the State does not argue that the conduct was not unitary in this case, but rather relies on the second prong of the *Swafford* test to argue that there is no double jeopardy violation. We conclude that the conduct was unitary because Child was charged with taking Powell's 1996 Oldsmobile under both statutes. *See Frazier*, 2007-NMSC-032, ¶ 24 (explaining that when the same conduct supports two different statutory offenses, there is "no way for the conduct *not* to be unitary"). Next, "we proceed to the second part of the *Swafford* analysis to determine whether the Legislature intended to allow multiple punishments based on the facts and circumstances of this case." *State v. Franco*, 2005-NMSC-013, ¶ 11, 137 N.M. 447, 112 P.3d 1104.

**2. Application of the *Blockburger* Test Indicates that the Legislature Did Not Intend to Cumulatively Punish Unitary Conduct for the Crimes of (1) Armed Robbery Based on the Taking of a Vehicle and Keys and (2) the Unlawful Taking of a Motor Vehicle**

**{55}** "[T]he sole limitation on multiple punishments is legislative intent, and, unless the Legislature clearly authorized multiple punishments, we apply the test articulated in *Blockburger v. United States*, 284 U.S. 299, 304 (1932), to determine that intent." *Franco*, 2005-NMSC-013, ¶ 12 (alteration in original) (citation omitted). In the instant case, the State does not contend, and we do not find, that the Legislature has expressly provided for multiple punishments. Neither Section 30-16-2 nor Section 66-3-504 contains any such language.[2] In the absence of express legislative authorization of multiple punishments, we

---

[2]We note, however, that our Legislature knows how to accomplish such a task and has expressly provided for multiple punishments in the case of other crimes that might,

move on to application of the *Blockburger* test. *See Swafford*, 112 N.M. at 14, 810 P.2d at 1234.

**{56}** *Blockburger* provides that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 284 U.S. at 304. If the *Blockburger* test "establishes that one statute is subsumed within the other, the inquiry is over and the statutes are the same for double jeopardy purposes–punishment cannot be had for both." *Swafford*, 112 N.M. at 14, 810 P.2d at 1234; *see also Whalen*, 445 U.S. at 691-92 ("The assumption underlying the rule is that Congress ordinarily does not intend to punish the same offense under two different statutes. Accordingly, where two statutory provisions proscribe the same offense, they are construed not to authorize cumulative punishments in the absence of a clear indication of contrary legislative intent." (internal quotation marks omitted)).

**{57}** In *McGruder*, we compared the same two statutes now at issue and concluded that each statute required proof of a fact which the other did not. 1997-NMSC-023, ¶¶ 27-28. However, unlike the defendant in *McGruder*, Child was charged with taking a vehicle under both the armed robbery and unlawful taking of a motor vehicle statutes. *See* discussion *supra* Part III.A.1, ¶¶ 52-53. Therefore, in this case, we cannot fairly say that Child's unlawful taking of a motor vehicle conviction required "proof of an additional element absent in the robbery statute; that additional element is the taking of a motor vehicle." *McGruder*, 1997-NMSC-023, ¶ 27. Instead, it is plain that in Child's case both convictions required proof of the same theft of Powell's 1996 Oldsmobile. Thus, Child's unlawful taking of a motor vehicle conviction failed to require proof of a fact that the robbery statute did not. *Blockburger*, 284 U.S. at 304. Accordingly, we find that (1) Child's unlawful taking of a motor vehicle conviction was subsumed by his armed robbery conviction, and (2) his conviction for both resulted in double jeopardy.

**{58}** The robbery statute is a generic, multipurpose statute. Unlike Section 66-3-504, the unlawful taking of a motor vehicle statute, the robbery statute, Section 30-16-2, uses the phrase "anything of value" to describe stolen property and does not specify what type of property theft will be punished. Under this generic statute, any sort of property can supply the "anything of value" element of the crime, although separating out each item of property stolen during an armed robbery should not be used to create multiple convictions. If *Blockburger* is applied to the elements of the two offenses in the abstract, it appears that they

---

depending on the circumstances of the particular case, be precluded for double jeopardy purposes when charged together with robbery, armed or otherwise. *See* NMSA 1978, § 30-16-38 (1971) (providing that the statutory sections dealing with the various forms that credit card crimes might take "shall not be construed to preclude the applicability of any other provision of the criminal law of this state or any municipality thereof that presently applies or may in the future apply to any transaction that violates the cited provisions").

21

are not identical because proof of armed robbery, which may involve the theft of any type of property, will not always entail proof that an automobile was taken, a necessary element of unlawful taking of a motor vehicle. In this case, however, Child's conviction for armed robbery required the State to prove the same taking of Powell's 1996 Oldsmobile that had to be proven to sustain the unlawful taking of a motor vehicle conviction. It is therefore the State's legal theory of the crime that supplies the "anything of value" element of robbery in each and every case where that crime is charged, and it is to that legal theory, and not the particular facts of the case, to which we will turn when we apply *Blockburger*. *See Pandelli*, 635 F.2d at 538 ("Courts have always looked to the law the indictment claims the defendant violated. If they did not do so, they would not know even what statutes are at issue under the Blockburger rule. What the reviewing court must do now in applying Blockburger is go further and look to the legal theory of the case or the elements of the specific criminal cause of action for which the defendant was convicted *without examining the facts in detail*." (emphasis added)); *accord United States v. Barrington*, 806 F.2d 529, 534 (5th Cir. 1986) (acknowledging that for purposes of the *Blockburger* test, the comparable proof of two offenses must be examined with respect to the particular case). In addition to referencing both *Whalen* and *Pandelli* in *Swafford*, we expressly approved the use of a modified version of the *Blockburger* test in the case of alternatively written statutes in *Franco*, where we explained that

> [a]s *Swafford* suggested, we treat statutes written in the alternative as separate statutes for purposes of the *Blockburger* analysis. This means that instead of looking at the statute in the abstract, we look at the legal theory of the offense that is charged. Nevertheless, we then compare the elements of the specific criminal cause of action for which the defendant was convicted without examining the facts in detail. The reason for this approach is that a statute that serves several purposes and has been written in the alternative may have many meanings and a wide range of deterrent possibilities. Unless we focus on the relevant alternatives, we run the risk of misconstruing legislative intent.

2005-NMSC-013, ¶ 14 (internal quotation marks and citations omitted).

**{59}** The State contends that Section 30-16-2 is not a statute written in the alternative, and therefore that the modified version of the *Blockburger* test should not apply. However, as *Pandelli* points out, it is not just statutes that are explicitly written in the alternative that require courts "to ascertain the operation and deterrent purposes of such statutes for double jeopardy purposes by determining the elements–the legal theory–that constitute the criminal causes of action in the case at hand." 635 F.2d at 539. Rather, the same approach is applicable to "a statute that is multi-purposed and written with many alternatives, or is *vague and unspecific*." *Id.* at 538 (emphasis added). In this case, it is the use of the ambiguous phrase "anything of value" that makes Section 30-16-2 a "vague and unspecific" statute that demands the *Blockburger* test be applied by reference to the State's legal theory of the case.

**{60}** As a result of these principles, we conclude that Child's armed robbery conviction required proof of the taking of Powell's 1996 Oldsmobile, and it therefore subsumed the unlawful taking of a motor vehicle conviction, placing Child in double jeopardy. Accordingly, we vacate Child's conviction for unlawful taking of a motor vehicle contrary to Section 66-3-504, the lesser-included offense in this case.

## IV. SENTENCING LAW

**{61}** Child asserts that the district court erred by failing to order a pre-sentence report from adult probation services as required by NMSA 1978, Section 31-18-15.3(E) (1993), prior to sentencing him. He also claims that the district court abused its discretion by sentencing him under the mistaken belief that a life sentence was mandatory for his first degree murder conviction. He further claims that his life sentence violates the prohibition on cruel and unusual punishment.

### A. PREPARATION AND SUBMISSION OF A PRE-SENTENCE REPORT TO THE DISTRICT COURT AND THE PARTIES WERE MANDATORY CONDITIONS PRECEDENT TO CHILD'S SENTENCING

**{62}** Section 31-18-15.3(E) provides that "[p]rior to the sentencing of an alleged serious youthful offender who is convicted of first degree murder, adult probation services shall prepare a presentence report and submit the report to the court and the parties five days prior to the sentencing hearing." The State concedes that a pre-sentence report does not appear in the record and that Child and his attorney did not receive such a report. Instead, the State argues (1) the issue was not preserved, (2) it was the obligation of adult probation services and not the court, and (3) Child has not shown any prejudice. We reject the State's arguments and remand this case to the district court to re-sentence Child, but only after a pre-sentence report is submitted to the court and the parties.

**{63}** Initially, the State contends that Child failed to preserve this issue for appellate review under Rule 12-216(A) NMRA. However, "[a] trial court has no jurisdiction to impose a sentence except in accordance with the law," *State v. Mares*, 119 N.M. 48, 50, 888 P.2d 930, 932 (1994) (internal quotation marks and citation omitted), and, in this case, the question of whether the district court erred in sentencing Child implicates review of a sentencing procedure that has been mandated by our Legislature. If the district court did not follow the mandated procedure, it follows that it did not have jurisdiction to sentence Child. Therefore, we undertake review of Child's claim of error without further addressing the alleged infirmity in its preservation. Rule 12-216(B).

**{64}** The State's next argument is that Section 31-18-15.3(E) imposes the responsibility on adult probation services and does not require any action to be taken by the district court. Although adult probation services has the responsibility to prepare the pre-sentence report, the court is not permitted to sentence a youthful offender until two precedent conditions have been satisfied. First, a pre-sentence report must be prepared by adult probation services, and

second, the report must be submitted to the district court and the parties five days prior to the sentencing hearing. *See State v. Martinez*, 1998-NMSC-023, ¶ 12, 126 N.M. 39, 966 P.2d 747 ("A trial court's power to sentence is derived exclusively from statute."). It is axiomatic that the district court was not endowed with the authority to impose any sentence unless and until the mandatory conditions precedent to sentencing had been fulfilled. The State's statutory onus argument does not overcome this precept.

**{65}** The State's final argument is that Child's sentence should not be reversed because Child has failed to demonstrate that he was prejudiced by the error. In *State v. Jose S.*, 2007-NMCA-146, 142 N.M. 829, 171 P.3d 768, the Court of Appeals recently rejected a similar argument. In *Jose S.*, 2007-NMCA-146, ¶¶ 16, 17, the sentencing judge did not obtain a predisposition report from the Children, Youth and Families Department regarding Child's amenability to treatment as required by NMSA 1978, Section 32A-2-17(A)(3) (2005). The State argued, among other things, that Jose S. had failed to show prejudice. *Id.* ¶ 11. The Court of Appeals rejected the argument because although it agreed that Child had not shown prejudice, "Child is thwarted in his attempt to show prejudice because the reports do not exist." *Id.* ¶ 21. The court went on to emphasize that "Child has no way of demonstrating that the reports would be favorable to him and contrary to the trial court's determination because the reports were never created. This inability to demonstrate prejudice is itself prejudicial to Child." *Id.* We agree with the sensible reasoning of the Court of Appeals and apply it in this case to reject the State's argument.

**{66}** Having concluded that a pre-sentence report is mandatory in this case and otherwise rejecting all of the State's arguments, we reverse Child's sentence and remand to the district court with instructions that a pre-sentence report be prepared and submitted to the court and the parties prior to re-sentencing. To avoid any confusion upon re-sentencing, we note that a life sentence based on Child's first degree murder conviction is authorized, although not mandated, by statute. *See* § 31-18-15.3(D) (a "court may sentence [a serious youthful] offender to less than, but not exceeding, the mandatory term for an adult"). In light of our ruling, we do not reach Child's other sentence-related claims.

## V. CONCLUSION

**{67}** We reverse Child's sentence and remand for re-sentencing with instructions that a pre-sentence report be prepared and submitted to the district court and the parties prior to re-sentencing. We also vacate Child's conviction for unlawful taking of a motor vehicle because it violates the proscription against double jeopardy in this case. We affirm the district court on all other issues.

**{68}   IT IS SO ORDERED.**

_____
**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**

_____

**CHARLES W. DANIELS, Chief Justice**

_____

**PATRICIO M. SERNA, Justice**

_____

**PETRA JIMENEZ MAES, Justice**

**RICHARD C. BOSSON, Justice, specially concurring**

**BOSSON, Justice (specially concurring).**

**{69}**    I write separately to offer my own thoughts on the double jeopardy issue.  I agree with the result, and the new analytical tack taken in the opinion with respect to determining whether a conviction under a lesser criminal statute (unlawful taking of a motor vehicle) is subsumed within a conviction under a broader, more generic statute (armed robbery).  My difficulty is with how we deal with _State v. McGruder_, 1997-NMSC-023, ¶¶ 33, 39, 123 N.M. 302, 940 P.2d 150, _abrogated on other grounds by State v. Chavez_, 2009-NMSC-035, ¶ 26, 146 N.M. 434, 211 P.3d 891, which I believe should be given a swift and decent burial.

**{70}**    As the majority notes, the relevant inquiry for double jeopardy purposes is whether Child can be convicted for both (1) the unlawful taking of a motor vehicle and (2) armed robbery, after Child robbed Victim of his car ignition keys and then used those keys to take Victim's car.  We encountered a nearly identical situation fourteen years ago in _McGruder_.

**{71}**    It is helpful to quickly run through _McGruder_'s relevant facts.  After test driving a truck earlier in the day, McGruder returned to the truck owner's apartment where he shot and killed the man who answered the door.  _Id._ ¶ 4.  McGruder then entered a bedroom where the owner and her two-year-old daughter were located.  _Id._ ¶ 5.  He pointed the gun at the owner and demanded keys to the truck.  _Id._  The owner could not find the keys, so she searched from room-to-room as McGruder continued to threaten her with the gun.  _Id._  The owner eventually came upon a pair of keys belonging to the man who had been shot and attempted to give them to McGruder.  _Id._  However, he refused those keys and insisted that she retrieve keys to the truck.  _Id._  After a few minutes had passed, the owner was able to locate the truck keys and handed them over.  _Id._  McGruder then placed the gun on the owner's temple and threatened to kill her.  _Id._  The owner pleaded with him to spare her life because of her young child, who was standing behind the owner crying.  _Id._ Following this exchange, McGruder began to walk out of the apartment, but returned and again held the gun to the owner's head, warning her not to say anything about the incident.  _Id._ ¶ 6.  He then left the apartment, but on his way out, kicked the corpse of the man he had just shot and killed, calling him a "punk."  _Id._

25

**{72}** As to whether convictions for the crimes of unlawful taking of a motor vehicle and armed robbery violated double jeopardy, *McGruder*, 1997-NMSC-023, ¶ 28 applied our traditional two-part, double- description test from *Swafford v. State*, 112 N.M. 3, 810 P.2d 1223 (1991). *McGruder* held the following: (1) Defendant's conduct was not unitary, although the question was "close;" and (2) even if the conduct was unitary, under a strict application of the "same elements" test from *Blockburger v. United States*, 284 U.S. 299 (1932), looking at the elements in the abstract, neither statute was subsumed within the other because unlawful taking of a motor vehicle requires proof of an element that armed robbery does not, namely, taking a motor vehicle. *McGruder*, 1997-NMSC-023, ¶¶ 30-39. We also determined that the two statutes were intended to protect different interests—property and personal safety. *Id.* ¶ 37.

**{73}** While I agree with the majority that the two cases can be distinguished, I would go one step further and hold that *McGruder* erred in its double jeopardy analysis and should be overruled. First, I believe the conduct at issue in *McGruder* was in fact unitary. The two crimes were not sufficiently distinct in terms of "time and space," despite the brief lapse in time that occurred between the search for the keys and McGruder's subsequent removal of the vehicle. Admittedly, reasonable minds might view the time/space question differently. That said, I find the remainder of *McGruder's* unitary conduct analysis highly problematic. I do not believe we should have drawn an analytical distinction between the two crimes based on a finding that the armed robbery occurred when the keys were taken, while the unlawful taking of a motor vehicle occurred later, when McGruder drove away with the truck.

**{74}** In my mind, the only reasonable view of the facts in *McGruder* is that the object of the armed robbery was to acquire the truck, not the keys. Securing the ignition keys was no more than a necessary precondition to successfully entering and operating that truck. In this sense, the legal significance of the car keys in *McGruder* was based on their unique relationship to the object those keys were capable of accessing. This position comports with property law, particularly the special status conferred to keys under the law of gifts. When manual delivery of a gift is impractical, a donor may perform a constructive or symbolic delivery by "giving the donee the 'means of obtaining possession and control of the gifted property.'" Elizabeth Townsend Gard & Rachel Goda, *The Fizzy Experiment: Second Life, Virtual Property and a 1L Property Course*, 24 Santa Clara Computer & High Tech. L.J. 915, 936 (2007-2008) (quoting Herbert Hovenkamp & Sheldon F. Kurtz, *Principles of Property Law* 38 (6th ed. 2005)). Providing a key that grants access to the gifted property is the most widely recognized and oft-cited example of constructive or symbolic delivery. *Id.* Thus, the taking of keys by force to gain access to the truck subsumes the taking of the truck. Rationally, the two acts cannot be separated.

**{75}** Going beyond the unitary conduct analysis, I remain perplexed by *McGruder*'s application of *Blockburger's* "same elements" test. Under a straightforward application of *Blockburger*, we ask whether, in the abstract, each offense requires a legal element that the

other does not. *See State v. Frazier*, 2007-NMSC-032, ¶¶ 14-15, 142 N.M. 120, 164 P.3d 1; *Swafford*, 112 N.M. at 10, 810 P.2d at 1230. If one statute does not include a distinct element, that statute is subsumed within the broader and more encompassing law. *Frazier*, 2007-NMSC-032, ¶ 15. Contrary to our holding in *McGruder*, I do not believe that the unlawful taking of a motor vehicle statute contains a legal element that is not also found in the armed robbery statute. Under my reading of the two laws, a motor vehicle is just one type of property that could be classified as something of value. Therefore, when one takes a motor vehicle, or almost any other piece of property, one also, by definition, takes something of value. As I see it, under a routine *Blockburger* analysis, the "taking a motor vehicle" element from the unlawful taking of a motor vehicle statute is subsumed within the more general element relating to "anything of value" in the armed robbery statute. Armed robbery simply adds the element of taking by force. That *McGruder* held otherwise was error.

**{76}** While we are rightfully concerned not to reverse existing precedent without first being presented with an express argument based on principles of stare decisis, *State v. Riley*, 2010-NMSC-005, ¶¶ 33-35, 147 N.M. 557, 226 P.3d 656, it does us no good to act tentatively in this instance. For all practical purposes, the majority opinion already overrules *McGruder*, although it does so implicitly. The majority opinion effectively reverses *McGruder* by applying a completely different (and much improved) version of the *Blockburger* test than we used to decide *McGruder*. In so doing, we reach exactly the opposite result that the *McGruder* court did, even though we are again analyzing the same statutes. For the benefit of the bench and bar, we should be clear that applying *Pandelli v. United States*, 635 F.2d 533 (6th Cir. 1980) amounts to a rejection of our reasoning in *McGruder*.

**{77}** That being said, I wholeheartedly agree with the majority's decision to directly incorporate *Pandelli* into our jurisprudence. The *Pandelli* rule has much to offer, particularly here, where a motor vehicle, or any piece of property for that matter, would normally be subsumed within the broader "anything of value" language under a strict application of *Blockburger*. It bears mentioning that *Pandelli* represents a significant shift away from our previous holdings, in which we have instructed lower courts to look at the legal elements in the abstract when determining whether one crime is subsumed within another.

**{78}** As we open the door to future use of *Pandelli*, we must also ensure that its use is properly circumscribed. Looking beyond the indictment and jury instructions to the specific facts of the case would portend retreating from *Swafford* and returning to the fact-based, ad hoc double jeopardy adjudications that characterized our pre-*Swafford* cases. *See Swafford*, 112 N.M. at 10-15, 810 P.2d at 1230-35 (explaining New Mexico's double jeopardy law at the time *Swafford* was issued). While it makes sense to allow a party to look at the specific language used in the indictment along with the jury instructions to analyze the state's "legal theory," any factual inquiry beyond those two limited areas has not been sanctioned by this Court. But at the same time, something creative is happening whereby this Court, for the

27

first time in twenty years, is rethinking some of the underpinnings of our double jeopardy jurisprudence. We encourage constructive critical thinking from counsel and from our colleagues on the Court of Appeals in terms of where this process should lead.

{79}    Regarding the application of *Pandelli* to the instant case, I agree with the majority's resolution, albeit with some hesitation.  This case is clearly much easier than *McGruder*. Here, the indictment, as controlled by the State through the drafting process, identified the specific items of value that Child was alleged to have taken during the armed robbery. Unlike *McGruder*, the armed robbery indictment specifically lists the car that forms the basis of the unlawful taking of a motor vehicle charge.  Because the thing of value in this case is the car, Child's conviction for the unlawful taking of a motor vehicle is unquestionably subsumed within the broader armed robbery conviction.  I am, however, concerned that we not create the impression that under *Pandelli* double jeopardy problems can be avoided by clever indictment drafting.  A prosecutor should not be allowed to defeat the constitutional protections afforded by the double jeopardy clause by simply indicting for armed robbery based on the theft of ignition keys without ever mentioning the underlying vehicle.

{80}    I would not leave open the question of what might have occurred had the armed robbery indictment referred to ignition keys alone, as was the case in *McGruder*.  When applying *Pandelli*, we should not lose track of what a key symbolizes, which is the underlying property.  For this reason, I find no distinction in terms of "legal theory" between car ignition keys and the vehicle to which those keys belong.  When the victim of a robbery unwillingly gives up his or her car keys under threat of force, that victim has transferred possession of both keys and vehicle, much like a donor who delivers a gift by way of a key. This view finds support among property law teachings while also embracing a common sense approach to the law.

{81}    While I concur in Justice Chavez's well reasoned and original approach to double jeopardy, I remain troubled by the notion in *McGruder* that unlawfully taking a vehicle can be considered a separately punishable crime from forcibly stealing a set of ignition keys to start and drive away in that same vehicle. *McGruder* was wrong in 1997, is wrong now, and should be corrected for the future.

_____

**RICHARD C. BOSSON, Justice**

**Topic Index for *State v. Gutierrez*, Docket No. 31,619**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-AR | Appellate Review |
| AE-PA | Preservation of Issues for Appeal |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-CF | Confession |

| | |
|---|---|
| CT-DJ | Double Jeopardy |
| CT-FT | Fair Trial |
| CT-FA | Fourth Amendment |
| CT-MW | Miranda Warnings |
| CT-SI | Self Incrimination |
| CT-SU | Suppression of Evidence |
| CT-WR | Waiver of Rights |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-RB | Robbery |
| CL-TV | Taking of Vehicle |
| CL-UC | Unitary Conduct |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-CV | Change of Venue |
| CA-CH | Charging |
| CA-Cf | Confession |
| CA-DJ | Double Jeopardy |
| CA-EO | Elements of Offense |
| CA-FT | Fair Trial |
| CA-IN | Indictment |
| CA-IF | Information |
| CA-JS | Judgment and Sentencing |
| CA-JI | Jury Instructions |
| CA-MC | Media Coverage |
| CA-MW | Miranda Warnings |
| CA-MR | Motion to Suppress |
| CA-PR | Pre-sentence Evaluation |
| CA-RA | Right Against Self-Incrimination |
| CA-SZ | Search and Seizure |
| CA-SI | Self Incrimination |
| CA-VJ | Vacating Judgment |
| | |
| **EV** | **EVIDENCE** |
| | |
| EV-AE | Admissibility of Evidence |
| EV-SU | Suppression of Evidence |
| | |
| **JG** | **JUDGES** |
| | |
| JG-AD | Abuse of Discretion |
| JG-JA | Judicial Authority |
| | |
| **JR** | **JURIES** |

| | |
|---|---|
| JR-IJ | Impartial Jury |
| JR-JS | Jury Selection |
| JR-VD | Voir Dire |
| | |
| **JD** | **JURISDICTION** |
| JD-DC | District Court |
| | |
| **JI** | **JURY INSTRUCTIONS** |
| JI-CJ | Criminal Jury Instructions |
| | |
| **ST** | **STATUTES** |
| ST-IP | Interpretation |
| ST-LI | Legislative Intent |
| ST-RC | Rules of Construction |