The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

### IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: **December 4, 2023**

**No. A-1-CA-40597**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**ADRIAN D. VASQUEZ a/k/a**
**ADRIAN DION VASQUEZ,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**Angie K. Schneider, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Leland M. Churan, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Nina Lalevic, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**WRAY, Judge.**

{1}     Defendant was convicted on multiple charges after entering a home with two other individuals—all three of them armed—to confront another individual about a romantic entanglement. The individual was not there, only three other teenagers, whom Defendant and the others kept in the home, with weapons drawn, in anticipation of a confrontation that never occurred. A jury convicted Defendant on eight counts: aggravated burglary with a deadly weapon, conspiracy, three counts of false imprisonment, and three counts of aggravated assault with a deadly weapon. At sentencing, the district court applied firearm enhancements, found aggravating circumstances, suspended a portion of the sentence, and ultimately sentenced Defendant to thirty years in prison. On appeal, Defendant argues that six of the convictions violate double jeopardy and that the district court abused its discretion in aggravating and enhancing the sentence. As to double jeopardy, we conclude that three of the convictions must be vacated, because Defendant's conduct was unitary and based on the State's theory of the present case, the Legislature did not intend to create separately punishable offenses. As to sentencing, we affirm in large part the district court's aggravation of Defendant's sentence but hold that whether Defendant "was armed" should not have been an aggravating factor in the present circumstances. We reverse and remand for resentencing.

**BACKGROUND**

{2}     J.S., who was seventeen years old at the time of the incident, testified that at about nine-forty-five or ten o'clock in the evening, she left her home to visit her boyfriend next door. She left the door unlocked, and left two friends, N.T. and N.Y., inside the home. After N.Y. and N.T. were left alone, Defendant walked into the room, and N.Y. did not know how Defendant got into the house. N.T. greeted Defendant and asked why he was there, Defendant pulled out a gun and said he was looking for another friend of theirs, T.B., whom Defendant believed had been sexually involved with A.C., Defendant's girlfriend. Defendant called for two other individuals to come into the room, and those two people also had guns. During this time, Defendant directed N.Y. and N.T. to sit down and the doors were locked. With weapon in hand, Defendant ordered N.Y. and N.T. to put their cell phones on a table.

{3}     When J.S. returned ten minutes later, the deadbolt was locked, and she banged on the door. Inside, Defendant told N.T. to open the door, and when N.T. opened the door, he told J.S. "there w[ere] people with guns in the house." J.S. did not believe N.T. and came inside. Once J.S. entered the "den area," where N.T. and N.Y. were seated, Defendant ordered her to sit down and put her cell phone on the table. J.S. testified that Defendant told them that he was "pretty much here to beat up [T.B.], shoot him . . . we're just waiting for [T.B.] to get here." T.B. eventually called J.S.'s cell phone. Defendant held the gun to J.S.'s head and told her to answer the

phone and tell T.B. to come inside. J.S. answered the phone and spoke with T.B. After the call, J.S. asked to go to the bathroom and escaped to the house next door for help. Defendant and the two other individuals left before the police arrived. T.B. did not come inside, and no one was physically injured.

{4} The jury convicted Defendant for each of the eight charged counts. The jury was additionally requested to find—and did find—that Defendant brandished a firearm for each charge, except the conspiracy charge. Defendant waived the right to have a jury decide aggravating circumstances, and at a later hearing, the district court found aggravating circumstances for five of the convictions, omitting only the three convictions for aggravated assault with a deadly weapon. The district court additionally enhanced all of Defendant's sentences based on the brandishing of a firearm during the commission of the crimes. Defendant received a sentence of fifty and one-half years, with twenty and one-half years suspended. Defendant appeals.

**DISCUSSION**

{5} Defendant raises three issues on appeal: (1) the punishment for each of the six convictions—arising from the three aggravated assault charges and the three false imprisonment charges—violates double jeopardy protections; (2) the district court relied on improper evidence to aggravate the basic sentences for Defendant's convictions; and (3) the district court did not instruct the jury to make the requisite findings to support the firearm enhancement for the conspiracy conviction. *See*

3

NMSA 1978, § 31-18-16(A) (1993, amended 2022) (requiring a "separate finding of fact by the court or jury" to enhance the basic sentence based on the brandishing of a firearm during the commission of a noncapital felony). The State concedes that the firearm enhancement for the conspiracy charge was not submitted to the jury, and having reviewed the record, we accept the State's concession. *See State v. Serrato*, 2021-NMCA-027, ¶ 13, 493 P.3d 383 (accepting the state's concession after review). We begin the remainder of our review with the double jeopardy arguments.

**I. Defendant's Punishment Based on Convictions for Aggravated Assault With a Deadly Weapon and False Imprisonment Violate Double Jeopardy Protections Under These Circumstances**

{6} The constitutional prohibition against double jeopardy protects against both subsequent prosecutions and multiple punishments, and we review these issues de novo. *State v. Begaye*, 2023-NMSC-015, ¶¶ 12, 533 P.3d 1057 (internal quotation marks and citation omitted).; *see* U.S. Const. amend. V; N.M. Const. art. II, § 15. The present case involves a multiple punishment scenario, and more specifically, a "double-description" claim in which Defendant argues that multiple punishments for convictions under different statutes were impermissibly based on the same, unitary conduct. *See Begaye*, 2023-NMSC-015, ¶ 12. For this analysis, we use a two-part test to first evaluate whether the conduct underlying the offenses is unitary and second determine whether the "[L]egislature intended to create separately punishable offenses." *Id.* ¶¶ 11, 13 (internal quotation marks and citation omitted).

4

Defendant contends that the convictions violate double jeopardy protections because (1) the conduct was "one, continuing act of restraint by gunpoint"; and (2) the Legislature did not intend for multiple punishments under these circumstances because the State used the same evidence to prove both crimes. Because both inquiries require us to consider the elements of the charged crimes, we first review the statutory elements of aggravated assault with a deadly weapon and false imprisonment. *See State v. Sena*, 2020-NMSC-011, ¶ 46, 470 P.3d 227 (considering "the elements of the charged offenses" in the unitary conduct inquiry); *Begaye*, 2023-NMSC-015, ¶¶ 22, 24 (considering the statutory elements of the charged offenses to evaluate legislative intent).

**{7}** In relevant part, the aggravated assault statute outlines three ways to commit the crime, by (1) "unlawfully assaulting or striking at another with a deadly weapon"; (2) "committing assault by threatening or menacing another while wearing a mask, hood, robe or other covering upon the face, head or body, or while disguised in any manner, so as to conceal identity"; or (3) "willfully and intentionally assaulting another with intent to commit any felony." NMSA 1978, § 30-3-2(A)-(C) (1963). Our Legislature has separately defined "assault," in relevant part, as "an attempt to commit a battery upon the person of another"; or "any unlawful act, threat or menacing conduct which causes another person to reasonably believe that [they are] in danger of receiving an immediate battery." NMSA 1978, § 30-3-1(A), (B)

(1963); *see also* NMSA 1978, § 30-3-4 (1963) (defining "battery" as "the unlawful, intentional touching or application of force to the person of another, when done in a rude, insolent or angry manner"). The false imprisonment statute states in its entirety, "False imprisonment consists of intentionally confining or restraining another person without [their] consent and with knowledge that [there is] no lawful authority to do so." NMSA 1978, § 30-4-3 (1963). With this statutory background, we turn to the double jeopardy analysis and "first ask whether the conduct was unitary, meaning whether the same criminal conduct is the basis for both charges." *State v. Reed*, 2022-NMCA-025, ¶ 8, 510 P.3d 1261 (internal quotation marks and citation omitted), *cert. denied* (S-1-SC-39187, May 3, 2022).

**A.     Defendant's Conduct Was Unitary**

{8}     The unitary conduct inquiry "turns on sufficient indicia of distinctness between the acts at issue," *id.* ¶ 9 (internal quotation marks and citation omitted), and "depends to a large degree on the elements of the charged offenses and the facts presented at trial." *State v. Porter*, 2020-NMSC-020, ¶ 12, 476 P.3d 1201 (internal quotation marks and citation omitted). We focus on Defendant's conduct to determine whether the acts were distinct from each other: "Conduct is not unitary, rather it is separate and distinct, when space and time separates the events." *See Reed*, 2022-NMCA-025, ¶ 9. Sometimes, however, we must make other inquiries or look to other sources to identify the significant conduct. *See Sena*, 2020-NMSC-011,

6

¶ 46 (identifying other considerations when time and space "do not suffice to make the determination"); *Porter*, 2020-NMSC-020, ¶ 12 (explaining the Court's role as "identify[ing] the criminal acts and the conduct at issue"). In those circumstances, "resort must be had to the quality and nature of the acts or to the objects and results involved." *Sena*, 2020-NMSC-011, ¶ 46 (internal quotation marks and citation omitted). Additionally, "we may consider the elements of the charged offenses, the facts presented at trial, and the instructions given to the jury . . . [and] whether the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses." *Reed*, 2022-NMCA-025, ¶ 9 (internal quotation marks and citations omitted). Courts have additionally "looked for an event that intervened between the crimes at issue, distinguishing the crimes from one another." *State v. Comitz*, 2019-NMSC-011, ¶ 39, 443 P.3d 1130; *see also Sena*, 2020-NMSC-011, ¶ 56 (concluding that the "crimes were separated by both time and intervening events"). We use these tools to determine whether "the conduct for which there are multiple charges is discrete (unitary) or distinguishable." *Swafford v. State*, 1991-NMSC-043, ¶ 28, 112 N.M. 3, 810 P.2d 1223. Where "it reasonably can be said that the conduct is unitary, then we must conclude that the conduct was unitary." *Porter*, 2020-NMSC-020, ¶ 12 (internal quotation marks and citation omitted).

{9} Defendant argues that the convictions for aggravated assault with a deadly weapon and false imprisonment are based on unitary conduct because Defendant committed one continuous act—holding the three victims at gunpoint. The State responds that the conduct was not unitary because Defendant produced the gun "to control the situation" and separately pointed the gun at or toward N.T. and N.Y. Specifically, the State focuses on a moment in which N.Y. dropped an item, and Defendant pointed the gun toward him. The State maintains that Defendant's conduct toward J.S. was also distinct—Defendant restrained J.S. with the gun when she entered the home and later held the gun to J.S.'s head during the phone call with T.B. Defendant responds, "Both convictions in this case were based upon [Defendant] entering the home with a gun and leading the victims to believe [Defendant] might commit a battery upon them, while at the same time using the gun to prevent them from leaving." Under the circumstances as they were developed at trial, we agree with Defendant, because "it reasonably can be said that" the acts that formed the basis for separate charges were not sufficiently distinct. *See Porter*, 2020-NMSC-020, ¶ 12. As we explain, Defendant's confining and threatening conduct was unitary—the same acts, not separated by space or time, confined the victims to the home and also caused the teenagers to fear for their safety. *See Reed*, 2022-NMCA-025, ¶ 14 (concluding that conduct was unitary where the elements for both crimes were "satisfied simultaneously"). Defendant's acts of pointing the gun

8

at specific victims, under these circumstances, were not separated by sufficient indicia of distinctness to conclude that the conduct was not unitary. *See Porter*, 2020-NMSC-020, ¶ 12.

**1.     Defendant's Single Act Simultaneously Restrained and Threatened the Victims**

{10}     The State argues that intervening events—Defendant's order to sit and the phone call—separated the restraint required for false imprisonment from the threatening conduct that established aggravated assault with a deadly weapon, but no time or space separated Defendant's criminal acts. Defendant simultaneously restrained and threatened the teenagers. Defendant entered the home and after speaking for a moment with N.T. and N.Y., pulled a gun from his waistband, and when the other two intruders appeared moments later, they were also armed. The guns remained visible for the rest of the time that Defendant was in the home. Thus, no time and space separated Defendant's acts that formed the basis for the two charges—pulling out the weapon and keeping the weapon in hand for the entire incident. *See Sena*, 2020-NMSC-011, ¶ 46 (evaluating first whether illegal acts were "sufficiently separated by either time or space (in the sense of physical distance between the places where the acts occurred)" (internal quotation marks and citations omitted)).

{11}     The "quality and nature" and the "objects and results" of Defendant's act further support a conclusion that the conduct was unitary. *See id.* (internal quotation

marks and citation omitted). J.S. testified that she sat down and stayed because "[w]hat else are you supposed to do when there are a bunch of people with guns?" All three of the confined teenagers testified that they did not feel free to leave and were afraid because they were told to stay, instructed to put their phones on a table, and Defendant and the others had guns in their hands. Defendant testified that he drew a weapon because he wanted the teenagers to know he was in control of the situation but also understood why the teenagers would have been frightened in this situation. Despite the orders given and the phone call, Defendant's use of the weapon to both restrain and threaten—to control—remained consistent.

{12}   Defendant's criminal acts of restraining and threatening the teenagers were not separated by any time or physical space, nor were they distinguishable by quality, nature, purpose, or object. *See id.* As we will develop more fully, the State's theory encouraged the jury to rely on Defendant's use of the gun and control of the situation—which the evidence demonstrates was accomplished by use of the gun— to prove both aggravated assault with a deadly weapon and false imprisonment. *See State v. Silvas*, 2015-NMSC-006, ¶ 10, 343 P.3d 616 (referencing the state's theory of the case within the unitary conduct analysis). As a result, "it reasonably can be said," *see Porter*, 2020-NMSC-020, ¶ 12, that Defendant's conduct was "not only unitary, but identical," *see Silvas*, 2015-NMSC-006, ¶ 10.

10

## 2.    The Completed Offense Doctrine Does Not Demonstrate That Defendant Committed Separate Acts

**{13}**    To demonstrate that the conduct was distinct, the State argues that the false imprisonment was completed before Defendant committed "distinct act[s] of aggression" by pointing the weapon at any specific victim. In some circumstances, we consider whether "one crime [was] completed before another [was] committed" in order to determine whether the conduct was unitary, which we refer to as the "completed offense doctrine." *Reed*, 2022-NMCA-025, ¶ 9; *see id.* ¶ 12 (referring to the "completed offense principle"). Before we deploy the completed defense doctrine, however, we must determine whether its application is appropriate to the State's arguments under these circumstances.

**{14}**    Defendant, citing *Reed*, argues that the State should not be permitted on appeal to separate the conduct when it did not separate the conduct for the jury. *See id.* ¶ 27. Our review of the record indicates that the State's case to the jury sufficiently suggested the distinctions raised on appeal—at least with respect to J.S. and N.Y. The jury instructions related to J.S. clearly permitted the jury to decide that Defendant committed aggravated assault with a deadly weapon by either brandishing the weapon or pointing it directly at J.S. In rebuttal closing, the State referred to the moment when N.Y. dropped an item and the jury was instructed that the State was required to prove that "[D]efendant brandished a firearm in front of [N.Y.]" Because the jury had the opportunity to apply the evidence to the instructions as the State

11

suggests on appeal, we will consider the State's arguments regarding distinct conduct by Defendant.

{15} Before we do that, we must clear one more hurdle. As Defendant notes, even if an aspect of his conduct could be viewed not to be unitary, we must consider whether the jury instruction permitted the jury to convict Defendant in the alternative—whether the jury could select conduct that is unitary with another charged offense or conduct that is not unitary with another charged offense. In that circumstance, we apply the "*Foster* presumption" and presume the jury relied on conduct that is unitary with another charged offense. *See State v. Foster*, 1999-NMSC-007, ¶ 37, 126 N.M. 646, 974 P.2d 140, *abrogated on other grounds as recognized in Sena*, 2020-NMSC-011, ¶¶ 47-53. In the present case, the aggravated assault with a deadly weapon jury instruction that pertained to J.S. permitted the jury to convict Defendant for either "brandish[ing] a pistol in front of [J.S.] or point[ing] the firearm at [J.S.]" The instruction pertaining to N.Y. permitted the jury to find aggravated assault if "[D]efendant brandished a firearm in front of [N.Y.]" These instructions were not specific as to the conduct on which the jury could rely. *See State v. Montoya*, 2011-NMCA-074, ¶ 39, 150 N.M. 415, 259 P.3d 820 (concluding conduct was unitary when the factual basis for the jury's verdict could not be determined from the jury instructions in the record). For both victims, the conduct could have been either the general threatening conduct that we have determined is

12

unitary with the restraining conduct or the specific threatening conduct, identified by the State. We therefore must continue to evaluate the distinctness of the specific conduct identified by the State—because if none or all of that conduct was unitary, there is no presumption to apply. *See Sena*, 2020-NMSC-011, ¶¶ 54, 56 (considering and rejecting the application of the *Foster* presumption in the context of the completed offense doctrine because none of the conduct was unitary).

**{16}** To determine whether the acts identified by the State were distinct conduct, we consider the State's arguments that (1) the false imprisonment was completed before these two incidents and (2) these two incidents were sufficiently distinct acts of aggression. The State contends that Defendant's act of restraint was "completed prior to the aggravated assaults" and points to *State v. Dominguez*, 2014-NMCA-064, 327 P.3d 1092, and *State v. Bachicha*, 1991-NMCA-014, 111 N.M. 601, 808 P.2d 51. In *Dominguez*, the defendant deceived the victim in order to get inside the home, pulled a gun from concealment, and threatened and held the gun to the victim's head. 2014-NMCA-064, ¶¶ 2-3. After that, with the gun still to her head, the defendant forced the victim into a bedroom and sexually assaulted her. *Id.* ¶ 3. This Court determined that the defendant's use of force to kidnap the victim was factually distinct from the conduct supporting the criminal sexual penetration conviction. *Id.* ¶ 10. The use of force to accomplish the kidnapping was "complete" when the victim was restrained by the weapon, "even though the restraint

13

continue[d] through the commission of a separate crime." *Id.* The *Dominguez* defendant held the victim at gunpoint, which rendered the encounter with the victim involuntary, "and it was not until [the d]efendant moved [the v]ictim to the back bedroom that he used the gun to restrain her during the" sexual assault. *Id.* As a result, the use of the gun to restrain and to force a sexual assault did not "create unitary conduct out of the independent and factually distinct bases for these crimes." *Id.*

{17}    The defendant in *Bachicha* allowed his estranged wife and two companions into his home in order to permit his wife to gather belongings. 1991-NMCA-014, ¶ 2. Thereafter, the defendant produced a weapon, ordered one of the victims into a room where the other two were working, and then ordered all three victims to stand against a wall. *Id.* The defendant's wife tried to escape. *Id.* ¶ 3. The defendant grabbed her hair and forced her to the floor with the gun to her head. *Id.* Another victim tried to help her, and the defendant pointed the gun at him and ordered him back to the wall with verbal threats of violence. *Id.* Without warning, the defendant then shot the third victim. *Id.* The defendant argued that the resulting three counts of false imprisonment should have merged with the three counts of aggravated assault with a firearm. *Id.* ¶ 6. This Court distinguished the defendant's act of false imprisonment from the acts of assault as follows: "there is evidence from which the jury could properly find that defendant committed multiple acts of aggravated

14

assault against each victim by specifically directing and redirecting the rifle at each of them, accompanied by verbal threats, while falsely imprisoning each of them." *Id.* ¶ 8. As a result, the "assaultive acts . . . did not constitute a single continuous offense of aggravated assault upon the three victims so as to merge into the offense of false imprisonment." *Id.*

{18} The State additionally cites *Comitz*, 2019-NMSC-011, and argues that the two "distinct act[s] of aggression"—relating to J.S. and to N.Y.—were separate from Defendant's use of the gun for restraint. In *Comitz*, our Supreme Court concluded that an assault that began with pointed weapons and yelling concluded as the sound of a siren passed and the parties quieted and lowered their guns. *Id.* ¶¶ 40, 42. The confrontation resumed when the sound diminished and the aggravated batteries occurred. *Id.* Because the defendant rejected an opportunity to walk away and instead resumed the confrontation, the paused argument and siren stood "as identifiable points marking the completion of the assaults (the initial pointing of guns) and the forthcoming batteries." *Id.* ¶ 42. Based on *Comitz*, *Dominguez*, and *Bachicha*, the State argues that the false imprisonment was completed when the identified distinct acts of aggression occurred and that as a result, Defendant's conduct was not unitary.

{19} Although *Dominguez* and *Bachicha* make clear that a defendant can be convicted without running afoul of double jeopardy protections when "the same *type*

15

of force" is used for restraint and assault, the facts in the present case are different in a key respect. In *Dominguez*, the false imprisonment began before the threatened sexual assault. 2014-NMCA-064, ¶ 10. In *Bachicha*, the false imprisonment began before the distinct individual assaults on each victim. 1991-NMCA-014, ¶¶ 2-3. In the present case, Defendant's use of the gun to restrain the teenagers did not continue through to the commission of the separate crime of aggravated assault. Instead, the restraint and the threat were simultaneous and ongoing. Both crimes began and were completed at the same time—when Defendant drew the weapon to both restrain and threaten. When J.S. later entered the room, the gun continued to serve to restrain and threaten her and the others. The simultaneous and ongoing crimes of false imprisonment and aggravated assault with a deadly weapon of all three teenagers continued when Defendant turned the gun to J.S.'s head.

{20}    While at the time of the phone call, Defendant used the gun to threaten and coerce J.S. to act, this conduct was an extension of the earlier action to restrain and threaten. The other two teenagers remained restrained and threatened in the same manner. We are not unsympathetic to the increase in fear that Defendant's action caused J.S. The call, however, heightened the existing situation, rather than calmed it, and did not present a clear opportunity for Defendant to reconsider his involvement in the situation. These facts distinguish this case from *Comitz* and reinforce that the earlier restraining or threatening conduct continued when the call

16

came in and Defendant pointed the gun at J.S. *See* 2019-NMSC-011, ¶ 42 (noting that the sirens caused the parties to pause and gave the defendant the opportunity to reconsider the encounter and thereby drew a distinction between the acts before and after the siren). The simultaneous acts continued, unbroken, together, with greater effect. The indicia of distinct conduct—time, physical space, and the nature of the act—remained the same. *See Sena*, 2020-NMSC-011, ¶ 46. The specific act was not separated by even seconds or any physical space and the nature of the act of pointing the gun was not "separate and distinct" from the ongoing assault and false imprisonment. As a result, Defendant's act of putting the gun to J.S.'s head—in this context and sequence of events—remained unitary conduct.

{21} Defendant's actions toward N.Y. also remained unitary. Defendant's conduct in pointing the gun toward N.Y. after he moved suddenly to pick up an item that he had dropped is consistent with using the gun to keep control of the room—the timing, physical location, and nature and object of Defendant's use of the gun did not shift. Indeed, the State referred generally to this moment in its rebuttal closing as an example of why the teenagers were not free to leave. Defendant continued to threaten and restrain N.Y. with the gun. As a result, Defendant's use of the gun in relation to N.Y. was unitary. *See Swafford*, 1991-NMSC-043, ¶ 28 ("[I]t must be kept in mind that the task is merely to determine whether the conduct for which there are multiple

17

charges is discrete (unitary) or distinguishable[, and i]f it reasonably can be said that the conduct is unitary, then one must move to the second part of the inquiry.").

**{22}** We therefore conclude that Defendant's acts were unitary, and because there was no distinct conduct on which the jury could have relied in the alternative, we need not apply the *Foster* presumption.

**B.** **The Legislature Did Not Intend Multiple Punishments for Aggravated Assault With a Deadly Weapon and False Imprisonment Under These Circumstances**

**{23}** Having determined that Defendant's conduct was unitary, "we proceed to ask whether the Legislature intended to create separately punishable offenses." *Reed*, 2022-NMCA-025, ¶ 8 (alteration, internal quotation marks, and citation omitted). To discern the Legislature's intent, we look first to the language of the statutes to determine whether separately punishable offenses are explicitly authorized. *See Begaye*, 2023-NMSC-015, ¶ 21. Neither the aggravated assault with a deadly weapon statute, § 30-3-2, nor the false imprisonment statute, § 30-4-3, explicitly authorize multiple punishments. As a result, we turn to other cannons of statutory construction to determine whether the Legislature intended to create separately punishable offenses, *see Begaye*, 2023-NMSC-015, ¶ 21, and employ either the strict-elements test, as laid out in *Blockburger v. United States*, 284 U.S. 299, 304 (1932), or if the statutes are "vague and unspecific or are written in the alternative," *Begaye*, 2023-NMSC-015, ¶ 17, the modified *Blockburger* test, set forth in *State v.*

18

*Gutierrez*, 2011-NMSC-024, ¶ 48, 150 N.M. 232, 258 P.3d 1024. *See Begaye*, 2023-NMSC-015, ¶¶ 15-18. We agree with the parties that the modified *Blockburger* test applies, and compare the elements of the two offenses, "looking at the [s]tate's legal theory of how the statutes were violated." *See Begaye*, 2023-NMSC-015, ¶ 24 (internal quotation marks and citation omitted). We first consider "the statutory language, charging documents, and jury instructions used at trial." *Id.* (internal quotation marks and citation omitted). If this inquiry does not reveal the State's legal theory, we evaluate the testimony, opening arguments, and closing arguments. *See id.*

{24} This modified *Blockburger* inquiry into Legislative intent bears remarkable similarity to the unitary conduct inquiry, but the purpose of each inquiry remains separate. The unitary conduct analysis looks to the conduct to determine whether that conduct is separate and distinct. *Swafford*, 1991-NMSC-043, ¶ 28. We use the statutory elements of the offense and the indicia of distinctness, which are often drawn from testimony and the state's arguments to the jury, to identify the relevant conduct and consider whether the acts can be distinguished from each other. Only if the conduct cannot reasonably be said to be separate do we turn to determine whether the Legislature intended to create separately punishable offenses. *Silvas*, 2015-NMSC-006, ¶ 11. The purpose of the modified *Blockburger* legislative intent inquiry, on the other hand, is to determine "whether the statute, *as applied by the*

19

[*s*]*tate in a given case*, overlaps with other criminal statutes so that the accused is being punished twice for the same offense." *Begaye*, 2023-NMSC-015, ¶ 22 (internal quotation marks and citation omitted). In the modified *Blockburger* statutory construction analysis, we look to sources of information beyond the language of the statute because though the elements of some criminal offenses can appear to be distinct in the abstract, after inquiry into the state's legal theory about how the defendant violated the statutes, it can become clear that under that theory, the statutes at issue become identical or that one is subsumed within the other. *See Gutierrez*, 2011-NMSC-024, ¶ 58 (noting that without the context of the state's theory, "we run the risk of misconstruing legislative intent" (internal quotation marks and citation omitted)). Because the second inquiry is about legislative intent, we do not stop after we identify the state's theory. We must continue and "compare the elements of the two offenses" in the context of "the state's legal theory of the particular case as to how the statutes were violated." *Begaye*, 2023-NMSC-015, ¶ 17.

{25} To discern the State's legal theory, we first look to the charging documents and jury instructions for aggravated assault with a deadly weapon and false imprisonment. *See id.* ¶¶ 25-26. The amended indictment charged Defendant with three counts of aggravated assault with a deadly weapon by assaulting or striking each victim with a firearm and clarified that the State's legal theory for aggravated assault with a deadly weapon related solely to Section 30-3-2(A), which prohibits

20

"unlawfully assaulting or striking at another with a deadly weapon." Nevertheless, the amended indictment does not identify the State's legal theory as to how Defendant assaulted the victims with a firearm, and we look to the jury instructions for further elucidation. *See Begaye*, 2023-NMSC-015, ¶ 25. The district court instructed that to find Defendant guilty of each count of aggravated assault with a deadly weapon as to each victim, the jury would need to find the following relevant elements:[1]

1. [D]efendant brandished a pistol in front of [the victim] or pointed the firearm at [the victim].

2. [D]efendant's conduct caused [the victim] to believe [D]efendant was about to intrude on [the victim's] bodily integrity or personal safety by touching or applying force to [the victim] in a rude, insolent or angry manner;

3. A reasonable person in the same circumstances as [the victim] would have had the same belief; [and]

4. [D]efendant used a firearm.

This instruction further clarified the State's theory and asked the jury to find that Defendant assaulted the victims by brandishing or pointing a firearm—but under these circumstances, when the gun was visible for the whole incident and some testimony supported specific incidents of brandishing or pointing the gun, we remain

---

[1] The instruction was slightly modified for each victim. For N.Y., the State was required to prove that Defendant "brandished a firearm in front of [N.Y.]" and for N.T., that Defendant "brandished a firearm in the presence of [N.T.] or pointed a firearm at [N.T.]"

21

without sufficient factual context to identify the State's theory for the aggravated assault with a deadly weapon charges.

{26} The amended indictment also charged Defendant with three counts of false imprisonment, one for each victim, and alleged that Defendant restrained or confined each victim "against [their] will and with the knowledge that he had no authority to do so." The amended indictment "shed[s] little light on the State's legal theory" as to *how* Defendant restrained or confined any of the victims. *See id.* This question is not answered by the jury instruction for false imprisonment, which generically stated the relevant elements as follows:

> 1. [D]efendant restrained or confined [the victim] against [the victim's] will; [and]
>
> 2. [D]efendant knew that he had no authority to restrain or confine [the victim].

Because the indictment and jury instruction are not clarifying, we continue to evaluate the "testimony, opening arguments, and closing arguments to establish whether the same evidence supported [the] defendant's convictions [for] both" aggravated assault with a deadly weapon and false imprisonment. *Id.* ¶ 24 (internal quotation marks and citation omitted).

{27} In opening argument, the State informed the jury that at the end of trial, it would ask for guilty verdicts for aggravated assault with a deadly weapon "for each victim, those would be [J.S., N.T., and N.Y.] all of which had guns pointed at them

22

and were threatened and believed that they might be shot during this incident." Regarding false imprisonment, the State explained that it would seek guilty verdicts for false imprisonment "for [the victims] being restrained or confined within that home without any reason to do so." These statements provide little clarification, but as the testimony proceeded, the State's theory began to take shape. Each of the victims testified that after Defendant entered the home, they did not feel free to leave and stayed in part because Defendant and the two other people with him were armed and during the incident the doors were locked. In closing argument, the State maintained that Defendant was guilty of aggravated assault with a deadly weapon if his behavior caused the victims to "believe[] reasonably that they could be shot or were about to be shot or otherwise injured by [D]efendant or his co-conspirators." The State also argued that the only proof necessary for false imprisonment was that Defendant "restraine[d] or confine[d] the victims without legal authority, with the knowledge that he has no authority to do that." The State additionally pointed out that Defendant testified that he had studied police and military tactics about how to control the victims' movements but that Defendant had "zero legal authority to restrain or confine anyone . . . Defendant has no power to arrest anyone and that's what makes him guilty of false imprisonment."

{28} Based on these arguments supporting the State's theory, we plug that theory of the two crimes into the statutory scheme. Based on the statute, the charging

23

documents, and the jury instructions, the State's theory as to aggravated assault with a deadly weapon was that Defendant unlawfully brandished a pistol in front of the victims or pointed the firearm at them (the unlawful threat element); that Defendant's conduct caused the victims to believe that Defendant was about to intrude on their bodily integrity or personal safety by touching or applying force to them in a rude, insolent or angry manner; that a reasonable person in the same circumstances as the victims would have had the same belief; and that Defendant used a firearm (the firearm element). The evidence and argument at trial demonstrates that the State used the evidence of Defendant's brandishing or pointing of a gun in front of or at the victims to establish the unlawful threat element. For false imprisonment, the jury had to have found that Defendant restrained or confined the victims against their will (the restraint element), and that Defendant knew that he had no authority to do so (unlawful element). At trial, the evidence showed that the victims stayed put because Defendant and his companions had guns. Thus, the jury necessarily found that (1) the State satisfied the restraint element of false imprisonment and the unlawful threat element of aggravated assault with the evidence that Defendant brandished or pointed a gun; and (2) the State satisfied the unlawful element of false imprisonment with the same evidence that would demonstrate that the aggravated assault was "unlawful." All of the elements of false imprisonment are, under these circumstances, identical to the elements of aggravated

assault with a deadly weapon, and therefore the crime of false imprisonment is subsumed entirely within the crime of aggravated assault with a deadly weapon. *Cf. State v. Franco*, 2005-NMSC-013, ¶ 12, 137 N.M. 447, 112 P.3d 1104 (explaining that a presumption that the Legislature intended separate punishment arises if neither statute subsumes the other—"if each offense requires proof of an element that the other does not").

**{29}** Because, under the State's theory, the false imprisonment elements were subsumed within the aggravated assault with the deadly weapon elements, Defendant's right to be free from double jeopardy was violated and "the inquiry is over." *Begaye*, 2023-NMSC-015, ¶¶ 35-36 (internal quotation marks and citation omitted). If a defendant is wrongfully put in jeopardy twice for the same conduct, one conviction must be vacated, and if "both offenses result in the same degree of felony, the choice of which conviction to vacate lies in the sound discretion of the district court." *Porter*, 2020-NMSC-020, ¶ 42. As both offenses in the present case were fourth degree felonies, *see* § 30-3-2; § 30-4-3, the choice of which of the convictions to vacate lies with the district court, *see Begaye*, 2023-NMSC-015, ¶ 36. We therefore remand for the district court to vacate three of Defendant's convictions and resentence him. *See id.*

## II. That Defendant "Was Armed" Cannot Be an Aggravating Factor Under These Circumstances

**{30}** Defendant additionally argues that the district court abused its discretion in aggravating his sentences. *See Swafford*, 1991-NMSC-043, ¶ 40 (applying the abuse of discretion standard of review). NMSA 1978, Section 31-18-15.1(A)(2) (2009) addresses the alteration of a basic sentence, including aggravating circumstances, as follows: "The judge may alter the basic sentence . . . upon . . . a finding by a jury or by the judge beyond a reasonable doubt of any aggravating circumstances surrounding the offense or concerning the offender." In aggravating a sentence, the district court "shall not" consider, in relevant part, whether a firearm was used "as provided in Section 31-18-16," the provision permitting a separate firearm enhancement. Section 31-18-15.1(C)(1). Defendant contends that (1) Section 31-18-15.1 is void for vagueness; (2) the aggravating circumstances the district court cited were improper; (3) the district court did not make written findings; and (4) the district court appeared "to assume that [Defendant]'s sentences would be aggravated by one-third or not aggravated at all." We resolve Defendant's first, third, and fourth arguments before turning to the factors the district court considered to aggravate the sentences.

**{31}** As Defendant concedes, our Supreme Court has already held that Section 31-18-15.1 is not void for vagueness. *See State v. Segotta*, 1983-NMSC-092, ¶ 8, 100 N.M. 498, 672 P.2d 1129. We are bound by that holding. *See State ex rel. Martinez*

26

*v. City of Las Vegas*, 2004-NMSC-009, ¶ 20, 135 N.M. 375, 89 P.3d 47 (stating that "the Court of Appeals remains bound by Supreme Court precedent" (alteration, omission, internal quotation marks, and citation omitted)). We further see nothing in the statute or the record to support Defendant's third and fourth arguments. Section 31-18-15.1(F) does not require written findings but only that the district court "issue a brief statement of reasons for the alteration and incorporate that statement in the record of the case." *State v. Bernal*, 1987-NMCA-075, ¶ 11, 106 N.M. 117, 739 P.2d 986 (internal quotation marks and citation omitted); *see id.* ¶ 12 ("We hold that the oral statement of reasons was part of the 'record of the case' within the meaning of Section 31-18-15.1."). The district court stated the reasons on the record at the sentencing hearing, both at the beginning and near the end of sentencing. Defendant argues that we should reconsider *Bernal* and our reading of Section 31-18-15.1. We decline, however, to require more than the statute mandates, and the district court's reasons for aggravating Defendant's sentence were stated on the record. *But see Bernal*, 1987-NMCA-075, ¶ 11 ("Appellate review would be easier if the trial court had filed a written statement of its reasons for alteration of a basic sentence, as part of the court file."). The district court's aggravated sentences further comply with the statutory directive that "in no case shall the alteration exceed one-third of the basic sentence." Section 31-18-15.1(G). The statute does not require the district court to

consider and reject a lesser than one-third aggravation of the sentence. We therefore discern no error relating to these arguments.

{32} For the remaining argument, Defendant contends that the district court improperly aggravated the sentences based on the following factors: (1) Defendant was armed and armed the other intruders; (2) Defendant used the cover of darkness; (3) the victims suffered trauma; (4) the victims were minors; (5) the victims were innocent parties who were unrelated to the source of Defendant's anger; and (6) Defendant's demeanor at trial. While we largely agree with the State that the district court appropriately considered aggravating factors, the district court's finding that Defendant "was armed" is not an appropriate aggravation under these circumstances. Section 31-18-15.1(C)(1) explicitly prohibits the district court from aggravating a sentence based on "the use of a firearm, as provided in Section 31-18-16." This Court has previously explained that "[i]t is *any* use of any firearm that invokes Section 31-18-16." *State v. Roper*, 2001-NMCA-093, ¶ 15, 131 N.M. 189, 34 P.3d 133 (emphasis added). In *Roper*, the district court aggravated the sentence based on the use of a firearm not "because of the mere use of any firearm," but because the "[d]efendant used a particularly fearsome firearm and the entire episode in which [the d]efendant was involved put a large number of people at risk." *Id.* In the present case, no "particular use" of the firearm separates the jury's finding that Defendant "brandished" a firearm in order to enhance the sentences under Section 31-18-16

28

from the fact that Defendant "was armed," as the district court found for the purposes of aggravation. As a result, the fact that Defendant "was armed" was not an appropriate basis for aggravation under the circumstances and the aggravation of Defendant's sentence must be reconsidered in this respect.

{33} Because we have concluded that the jury did not find sufficient facts to establish firearm enhancement in relation to the conspiracy to commit aggravated burglary conviction, we must consider the district court's aggravation of the conspiracy conviction apart from Section 31-18-15.1(C)(1). That Defendant "was armed" does not preclude aggravation under the other provision that Defendant invokes, Section 31-18-15.1(C)(4), because whether Defendant "was armed" was not an element of conspiracy. *See State v. Chavez*, 1983-NMSC-037, ¶ 10, 99 N.M. 609, 661 P.2d 887 (defining conspiracy "as a common design or agreement to accomplish an unlawful purpose or a lawful purpose by unlawful means"). Nevertheless, as we have noted, the jury was instructed that the conspiracy was established if Defendant agreed with another to commit aggravated burglary and had the intent to commit aggravated burglary. That Defendant "was armed" as he carried out the agreement is not a circumstance of the offense of conspiracy and does not aggravate the *agreement* that had already been reached. *See Segotta*, 1983-NMSC-092, ¶ 8 (defining the term aggravate in this context to mean "make worse, more serious, or more severe: intensify" (internal quotation marks and citation omitted)).

29

Accordingly, the district court abused its discretion to the extent that Defendant's conviction for conspiracy was aggravated because Defendant "was armed." *See Roper*, 2001-NMCA-093, ¶ 19 (explaining that "all matters *relevant* to the event for which [the d]efendant is tried and convicted are circumstances that may aggravate or mitigate" (emphasis added)).

**{34}** Otherwise, we hold that the district court relied on facts that were appropriate aggravating circumstances. *See id.*; *see also* § 31-18-15.1(B) (permitting the district court to consider "*any* aggravating circumstances surrounding the offense or concerning the offender" (emphasis added)). Defendant testified that he provided the weapons to the other two intruders, and as the State notes, this testimony was not necessary to prove the element of any crime. *See State v. Landgraf*, 1996-NMCA-024, ¶ 23, 121 N.M. 445, 913 P.2d 252 (permitting aggravation based on facts that are consistent with the convictions but "are not elements necessary to prove the crime"). The district court heard evidence that the conspirators invaded the home "under the cover of darkness," and that each of the victims was a minor. *See State v. Tortolito*, 1997-NMCA-128, ¶¶ 23, 24, 124 N.M. 368, 950 P.2d 811 (affirming the aggravation of a sentence because two children witnessed the event and the "[d]efendant induced terror in the victim by blindfolding her with a pillowcase during the attack"). At trial J.S. testified about the trauma she experienced, and at sentencing, a friend of all three victims testified about the negative impact the

30

experience had on the victims. *See Landgraf*, 1996-NMCA-024, ¶ 23 ("Aggravation may also be based on the nature and extent of the suffering caused."). Further, even though the victims were not the source of Defendant's ire, Defendant confined and threatened them despite T.B.'s absence from the house. Finally, the district court found that Defendant's manner in testifying was either alarmingly callous or "nonchalant." Defendant has not met the burden on appeal to demonstrate that the district abused its discretion in determining that these facts together were appropriate considerations "surrounding the offense or concerning the offender" for the purposes of aggravating Defendant's sentences. *See* § 31-18-15.1(A)(2); *State v. Aragon*, 1999-NMCA-060, ¶ 10, 127 N.M. 393, 981 P.2d 1211 (noting that "it is [the appellant]'s burden on appeal to demonstrate any claimed error" in the district court).

**CONCLUSION**

{35}     For the reasons stated herein, we reverse and remand for the district court to vacate three of the convictions, as set forth in this opinion, and resentence Defendant.

{36}     **IT IS SO ORDERED.**

_____
**KATHERINE A. WRAY, Judge**

31

**WE CONCUR:**

_____
**JACQUELINE R. MEDINA, Judge**

_____
**ZACHARY A. IVES, Judge**